IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 1:20CR424 |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES S. GWIN |
| | ) | |
| v. | ) | |
| | ) | |
| MARGARET COLE, | ) | GOVERNMENT'S TRIAL BRIEF AND |
| DEBRA PARRIS, | ) | MOTIONS *IN LIMINE* |
| DORAH MIREMBE, | ) | |
| | ) | |
| Defendants. | ) | |

The United States Attorney's Office for the Northern District of Ohio and the United States Department of Justice, Criminal Division, Fraud Section submit the following trial brief and motions *in limine* to (1) summarize the Government's position on evidentiary issues that may arise at the trial scheduled to commence on February 9, 2022, and (2) respectfully move the Court to order that certain evidence is admissible at trial and certain other evidence should be excluded. The Government further requests oral argument on its motions *in limine*.

I.     **STATEMENT OF THE CASE**

a.  **The Charges**

On August 13, 2020, a grand jury indicted defendant Margaret Cole on three felony charges:

- Count 11: conspiracy to defraud the United States in violation of 18 U.S.C. § 371.

- Count 12: false statement to an accrediting entity in violation of 42 U.S.C. § 14944.

- Count 13: false statement to an entity performing a central authority function, in violation of 42 U.S.C. § 14944.

ECF 1 (hereinafter, "Indictment").  The indictment's charges all arise from Cole's alleged misconduct in furtherance of the business of European Adoption Consultants ("EAC"), an intercountry adoption agency that Cole founded and led as the Executive Director.[1]

b.  **Summary of the Facts**

At trial the Government will present evidence showing the following:[2]

1.  *Intercountry Adoption from Poland*

Cole was the Executive Director of EAC, an Ohio-based agency that conducted intercountry adoptions, by which prospective adoptive parents in the United States would adopt orphans from overseas.  The United States Department of State ("State Department") is the federal agency primarily responsible for regulating intercountry adoption and the designated "Central Authority" under the Hague Convention on Protection of Children and Co-operation in Respect of

---

[1]     Cole's alleged co-conspirator Debra Parris pleaded guilty to Count 11 as well as to a separate conspiracy charge (Count 1), in which Cole was not charged.  (ECF 96.)  Defendant Dorah Mirembe remains at large.

[2]     This summary is intended to contextualize the evidentiary issues addressed below and to provide of an overview of the allegations.  It does not provide a complete recitation of the evidence that the Government intends to proffer at trial, where the Government anticipates calling 10 to 20 fact and summary witnesses and introducing numerous exhibits.

Intercountry Adoption ("The Hague Convention").  During the relevant period, the State Department carried out these functions, in part, through a designated accrediting entity, the Council on Accreditation ("COA").  EAC was accredited by COA, subject to COA's oversight, and agreed to comply with COA's rules and regulations.

The primary purpose of the regulation of intercountry adoption is to protect vulnerable orphan children and ensure that intercountry adoption is conducted safely and ethically. Critical protections to ensure the safety of intercountry adoption include, among other things, a social worker's report on the home in which the adoptee would be raised (the "home study"), which requires criminal background checks of the prospective adoptive parents.  Accredited agencies such as EAC are also required to have policies prohibiting preferential treatment for friends and family of employees because giving such preferential treatment could undermine the child's best interest.

    2.   *Cole's Plan for Poland Client to Relinquish Child 2 to Unvetted Relatives of an EAC Employee*

In approximately June and July 2015, EAC client Poland Client of Salt Lake City, Utah, travelled to Poland to pursue the adoptions of two Polish orphan siblings ("Child 1" and "Child 2").  EAC had established an adoption program in Poland in or around 2014, and by 2015 it was an important revenue source for Cole and EAC.[3]  Poland Client had completed the necessary training and vetting procedures, and the State Department had sent a letter to the Polish Central Authority that indicated the State Department's approval for them to adopt Child 1 and Child 2.

---

[3]    The Government will present summary testimony based on EAC's bank, financial and business records showing the extent that the Poland program contributed to EAC's finances.

The Polish Central Authority also received the completed home study for Poland Client that showed their suitability to complete an intercountry adoption.

Co-Conspirator 1 served as EAC's in-country representative for Poland Client (and other EAC clients) in Poland. While in Poland, Poland Client developed concerns as to whether they could adequately meet the physical and emotional needs of both Child 1 and Child 2, and they expressed that concern to Co-Conspirator 1. She told them that if they did not adopt both siblings, the siblings would be "red-marked" and unlikely to be adopted by anyone else.

Poland Client contacted Cole for assistance. In an email to Cole dated June 21, 2015, Poland Client described the concerns about raising both Child 1 and Child 2. Poland Client expressed a strong desire to find another family to raise Child 2, and she offered to travel to wherever in the United States that the other family resided to deliver Child 2. After receiving no email response from Cole, she emailed Cole again three days later and again expressed her intention not to keep custody of Child 2. Poland Client wrote to Cole, "I just want to follow up from my last email to see if there is anything [we] need to be doing to make the process run more smoothly for the dissolution."

Poland Client spoke to Cole multiple times from Poland. Poland Client considered—and told Cole that they decided against—temporarily placing Child 2 with a family living near where they lived in Utah. Poland Client was clear that they did not want to place Child 2 in temporary or foster care. Cole identified a few persons who would potentially adopt Child 2, including Parris Relatives 1 and 2, who lived in Texas. Cole described Parris Relatives 1 and 2 as having a biological child close in age to Child 2, which was one of the reasons Poland Client believed them to be a good fit. Poland Client understood that EAC executive Debra Parris was related to Parris

Relatives 1 and 2, and that Parris expected that Parris Relatives 1 and 2 would permanently adopt Child 2.

On June 29, 2015, Poland Client emailed Cole, "We are hopefully coming home sometime this week and we need to make a plan . . . We both feel that we would prefer that [Child 2] is with [Parris Relatives 1 and 2] . . . Have [they] been working on their home study?"  Cole never responded to that question.  Poland Client believed, however, that any family recommended by Cole and EAC to take permanent custody of Child 2 must have completed a home study and been vetted for adoption.

On July 1, 2015, Poland Client applied for visas for Child 1 and Child 2 and were interviewed at the United States Embassy in Warsaw, Poland.  Relying on directions from Co-Conspirator 1, Poland Client did not mention that they had taken steps to transfer custody of Child 2 to another family upon arrival in the United States.  On or about July 2, 2015, Poland Client obtained visas for both siblings.

On July 4, 2015, Poland Client traveled from Poland to Dallas/Fort Worth International Airport with Child 1 and Child 2.  There, they met Parris and executed documents relinquishing Child 2 to Parris Relatives 1 and 2.  Parris took Child 2 from Poland Client, and thereafter Child 2 lived with Parris Relatives 1 and 2 in Texas.  Poland Client traveled home to Utah with Child 1. They did not receive any information about Child 2 until August 2016, when they were contacted by a detective from Denton County, Texas.

EAC had not obtained a home study or a criminal background check of Parris Relatives 1 and 2—although Cole knew that families pursuing intercountry adoptions from Poland were required to complete home studies and undergo background checks.  In the months following July 4, 2015, Cole did not inform the State Department, COA, and the Polish Central Authority that

EAC had arranged the transfer of Child 2 to Parris Relatives 1 and 2.  Cole knew, however, that Parris Relatives 1 and 2 continued to have custody of Child 2 and that they intended for the arrangement to be permanent.

### 3. *Cole's Acts of Concealment and False and Fraudulent Statements*

On April 18, 2016, Cole caused EAC to submit a false report to COA related to the "disruption / dissolution" of the adoption of Child 2 (the "April 2016 COA Report").  The April 2016 COA Report concealed Cole's role in the relinquishment of Child 2 and contained the following false statements, among others: (1) that Poland Client initially transferred Child 2 to Parris Relatives 1 and 2 for respite (temporary) care; and (2) that the "disruption / dissolution" of the adoption of Child 2 occurred within 30 days of the report (on March 21, 2016), even though Parris Relatives 1 and 2 took custody of Child 2 in July 2015 and completed the adoption of Child 2 under Texas law in February 2016.  The April 2016 COA Report also concealed that Parris Relatives 1 and 2 were the relatives of an EAC employee.

On August 10, 2016, Parris contacted Adoption Counselor, a social services counselor. Parris told her that Child 2 required counseling.  Adoption Counselor then learned that Child 2 had been injured.  Adoption Counselor also learned that Child 2 had been placed into Parris Relative 1 and 2's home before they had completed a home study.  On the morning of August 12, 2016, Adoption Counselor told Parris that she felt obligated to report the situation to the authorities, and she told Parris that EAC was obligated to report it as well.  Parris called Cole later that same morning.  Adoption Counselor filed reports with local authorities in Texas and with COA.

Child 2 was taken to a children's hospital in Texas.  Medical staff identified severe injuries in several areas of Child 2's body.  They concluded that the injuries were sustained recently and could not have been self-inflicted.  Child 2's case was referred to local child protection authorities

and to the Denton Police Department, which initiated a criminal investigation.[4]  Parris Relatives 1 and 2 stated to the Denton Police Department that, in sum and substance, Child 2's recent injuries were caused by an accident, and that Child 2 must have been abused in Poland.  Detective David Bearden, however, communicated with Cole during his investigation and made clear that the focus of his criminal investigation was on recent, serious injuries that Child 2 had suffered in Texas, not in Poland.

On September 2, 2016, Cole reported Child 2's injury to COA (the "September 2016 COA Report").  Cole wrote, "[t]he family in question is not a EAC family."  Cole again concealed that Parris Relatives 1 and 2 were Parris's relatives and that Cole and EAC had facilitated the transfer of Child 2 to them.  Cole also wrote that "the incident [the injuries to Child 2] appeared to have occurred in Poland."

On October 19, 2016, the Dallas Observer published an article titled, "Horrific Abuse Allegations Shock Denton as Texas Falls Under Scrutiny to Protect Kids" (The "Observer Article").  The article reported that Parris Relative 1 had been arrested on charges of causing serious bodily injury to a child and that Parris Relative 2 had been charged with a crime as well. The article cited to a public affidavit submitted in support of Parris Relative 1's arrest, which stated that Child 2 would "require several surgeries and a colostomy bag to correct the injuries she received."[5]  *See* Ex. B (filed under seal).

On December 8, 2016, U.S. State Department personnel informed the Polish Central Authority that Child 2 had been physically abused.  The Polish Central Authority further learned

---

[4]      Medical records detailing Child 2's injuries have been produced in discovery.  The affidavit of Christi Thornill, RN, CPNP-AC, has been filed under seal as Exhibit A.

[5]      As described *infra*, a hard copy of the article was found in Cole's office during a search of the premises in February 2017.

that Child 2 was abused while in the custody of Parris Relatives 1 and 2—who were not the U.S. adoptive parents that had been approved by the Polish Central Authority (and by a Polish judge) to adopt Child 2.   Also on December 8, 2016, Co-Conspirator 1 forwarded Cole a link to the Observer Article, which Co-Conspirator 1 had received from the Polish orphanage where Child 2 previously lived.  *See* Ex C (filed under seal).

On December 9, 2016, the Polish Central Authority informed Cole by email that EAC's accreditation in Poland had been suspended.  The Polish Central Authority also emailed EAC a letter in Polish, dated that same day and signed by Director Olgierd Podgorski (the "Podgorski Letter").  Co-Conspirator 1 emailed Cole an English translation of the Podgorksi Letter that same day.   The Podgorski Letter requested that EAC provide information explaining the "illegal transfer" of Child 2 to Parris Relatives 1 and 2, who it described as "not prepared for the role of adoptive parents" and "suspected of having committed a criminal act against [Child 2]."  *See* Ex D (filed under seal).

Cole responded to the Podgorski Letter by letter dated December 11, 2016 (the "December 2016 Letter"), in which Cole, among other things: falsely represented that Parris Relatives 1 and 2 took custody of Child 2 for temporary care; concealed that Parris Relatives 1 and 2 were related to an EAC employee; and concealed her role in, and knowledge of, Child 2's transfer to Parris Relatives 1 and 2.  Cole also stated that Child 2's injuries likely originated in Poland and "likely no crime was committed" in Texas.

## II.  ANTICIPATED EVIDENTIARY ISSUES AND MOTIONS IN LIMINE

### a.  The Observer Article and Detective Bearden's Communications with Cole Are Essential to the Jury's Understanding of Cole's False and Fraudulent Statements

Cole's knowledge that Child 2 had been severely abused——and that Parris Relative 1 had been arrested and accused of abusing Child 2——is inextricably intertwined to the allegations and

8

therefore should be admitted.  Cole's motion to exclude this evidence (ECF 1118) should be denied.

The evidence will show that the Observer Article was squarely before Cole as she wrote the fraudulent December 2016 Letter.  Emails seized from Cole's email account show that Co-Conspirator 1 had emailed Cole a link to the article just three days before Cole sent the December 2016 Letter.  Further, a FBI agent will testify that a hard copy printout of the article—with a print date of December 8, 2016—was seized from Cole's office during the lawful execution of search warrant in February 2017.  *See* Exs. B, C.

The Observer Article, and the evidence of Cole's knowledge of the article, is squarely admissible under Sixth Circuit precedent permitting *res gestae* evidence or evidence of acts intrinsic to the charged crime.  In *United States v. Churn*, the Sixth Circuit explained:

> This court "ha[s] recognized the admissibility of *res gestae*, or background evidence, in limited circumstances when the evidence includes conduct that is 'inextricably intertwined' with the charged offense." *United States v. Clay*, 667 F.3d 689, 697 (6th Cir. 2012). "Proper background evidence has a causal, temporal or spatial connection with the charged offense." *Hardy*, 228 F.3d at 748. "[Such] evidence may include evidence that is a prelude to the charged offense, is directly probative of the charged offense, arises from the same events as the charged offense, forms an integral part of the witness's testimony, or completes the story of the charged offense." *United States v. Grooms*, 566 Fed. Appx. 485, 491 (6th Cir. 2014) (internal quotation marks omitted).

800 F.3d 768, 779 (6th Cir. 2015) (upholding admission of *res gestae* evidence).

Here, Cole is charged in Count 13 with making a false and fraudulent statement to the Polish Central Authority through the December 2016 Letter.  Indictment ¶ 98.  Cole wrote the December 2016 Letter in response to the Polish Central Authority's request that EAC explain the "illegal transfer" of Child 2 to Parris Relatives 1 and 2, who it described as "not prepared for the role of adoptive parents" and "*suspected of having committed a criminal act against [Child 2]*"

(emphasis added).  Thus, Cole knew that the Polish Central Authority was angry about the transfer of Child 2 to Parris Relatives 1 and 2 because it had heard that Child 2 had been criminally abused by Parris Relative 1.  Cole was therefore highly motivated to distance herself from Parris Relatives 1 and 2 even though, as the evidence will show, she had to make false statements in order to do so: after all, she and her co-conspirators planned for Poland Client to bring Child 2 into the United States and then relinquish the child to Parris Relatives 1 and 2.

Further, Cole's misleading attempt to convince the Polish Central Authority that Child 2 was likely abused in Poland, and not in the custody of Parris Relatives 1 and 2, is another important aspect of the December 2016 Letter.  The evidence will show that before Cole wrote the December 2016 Letter, she had communicated with Detective David Bearden, an experienced child abuse detective in the Denton County Police Department, about his investigation.  Bearden made clear to Cole that he was focused on the possibility of serious crimes having been committed in Texas based on the apparent recentness and severity of Child 2's injuries.  Nevertheless, Cole wrote in the December 2016 Letter that "the incident [the injuries to Child 2] appeared to have occurred in Poland."

The evidence that Cole had received the Observer Article and a printed copy of it was found in her office is admissible to provide the jury a proper understanding of Cole's motive for making a false and fraudulent statement to the Polish Central Authority.  Similarly, the evidence that Parris Relative 1 had been publicly reported to have been arrested for abusing Child 2 is admissible to provide the jury with a proper understanding of why the Polish Central Authority inquired into Cole and EAC's conduct, and the materiality to the Polish Central Authority of Cole's resulting falsehoods.  Further, the evidence of Cole's communications with Bearden is admissible

to provide the jury with an understanding of a critical aspect of the false and fraudulent nature of the December 2016 Letter.

In sum, all this evidence is highly probative of Cole's motive, of the materiality of her false statements, and her knowledge of her false statements. It bears on Cole's false statement to the Polish Central Authority charged in Count 13. It also bears on Cole's motive to continue the conspiracy to defraud the United States, which the indictment alleges continued through at least December 2016. Indictment ¶¶ 93-94. The evidence therefore should be admitted. As the Sixth Circuit has held, "[t]he jury is entitled to know that setting of a case. It cannot be expected to make its decision in a void—without knowledge of the time, place[,], and circumstances of the acts which form the basis of the charge." *United States v. Roberts*, 548 F.2d 665, 667 (6th Cir. 1977); *see also United States v. Dalton*, 266 Fed. App'x 381, 384 (6th Cir. 2008) (other acts evidence is "intrinsic" when the other acts "were necessary preliminaries to the crime charged").

This evidence also should not be excluded as unfairly prejudicial pursuant to Rule 403. There is no risk of unfair prejudice here—let alone unfair prejudice that substantially outweighs the evidence's significant probative value—because the evidence of alleged child abuse does not involve a bad act by Cole; rather, it only involves the bad act of Parris Relative 1. The jury will have no difficulty understanding that Parris Relative 1, not Margaret Cole, was reportedly arrested for abusing Child 2. To the extent the defense is concerned that the jury could seek to punish Cole for Parris Relative 1's bad acts, that concern could be addressed through a proper jury instruction. Further, the fact that Cole lied to the Polish Central Authority about her responsibility for placing a child in circumstances in which the child was later abused is not "unfairly prejudicial"—it is a central fact of the crime charged. *See United States v. Mellies*, 329 Fed. App'x 592, 598-99 (6th

11

Cir. 2009) (holding that evidence that is prejudicial "only in the sense that it paints the defendant in a bad light is not unfairly prejudicial").

Cole's citation to *United States v. Hazelwood*, 979 F.3d 398, 412 (6th Cir. 2020) is unavailing because the excluded evidence there bore no relation to the crimes charged.  (ECF 118 at 2.)  In *Hazelwood,* a case involving allegations of business fraud, the district court had admitted (as rebuttal character evidence) recordings of the defendant's private phone calls containing highly offensive and misogynistic remarks.  The Sixth Circuit reversed, holding that "there is simply no route on which the recordings make it more likely that [the defendant] committed fraud," and "[d]egrading African Americans and women during a private party is not probative of motive to conspire with others to defraud trucking companies of fuel discounts."  *Id.* at 411.  Here, the proposed evidence is inextricably intertwined with the charged crimes and highly probative of, among other things, Cole's motive and the materiality of her false statements.

Moreover, the Government does not intend to present evidence of Child 2's injuries other than what was reported in the Observer Article and what Cole was told by Detective Bearden. Christi Thornhill, Director of Trauma Services, Cook Children's Hospital, is on the Government's witness list and prepared to testify (as she testified at Parris Relative 1's criminal trial) about the injuries suffered by Child 2, the multiple surgeries required, and the near impossibility that such injuries could have been accidental or self-inflicted.[6]  The Government only intends to call Thornhill to testify, however, if Cole opens the door by disputing whether Child 2 was abused by Parris Relative 1.

---

[6]     Parris Relative 1 was convicted of three felonies arising from the abuse of Child 2 and sentenced to 48 years in prison.  The conviction was upheld on appeal.

**b.**      **The Noticed Emmons 404(b) Testimony Is Admissible to Show Cole's Knowledge, Motive, Intent and Absence of Mistake Statement in the Charged Crimes**

The Government provided notice of its intent to introduce at trial two items of evidence under Rule 404(b), including the following testimony of Kimberlea Emmons:

> In approximately 2015, Cole and Cole's alleged co-conspirator, Co-Conspirator 1, instructed another former EAC client in EAC's Poland program, Kimberlea Emmons, to tell specific, scripted lies to a Polish court in order (in Cole's view) to improve the likelihood that the Polish court would grant Emmons' adoption; when Emmons told Cole that she refused to do so, Cole reprimanded her and told her she was putting EAC's business in Poland at risk ("the Emmons 404(b) Evidence").

ECF 111.  The Emmons 404(b) Evidence thus shows Cole's willingness—during the relevant period, and in the same EAC Poland program——to carry out adoptions dishonestly, and to direct her clients to be dishonest with governing authorities, in order to further her adoption business.

The Sixth Circuit has established a three-step analysis to assess the admissibility of the proposed evidence:

> *First*, the court must decide whether there is sufficient evidence that the other act in question actually occurred.
>
> *Second*, if so, the court must decide whether the evidence of the other act is probative of a material issue other than character.
>
> *Third*, if the evidence is probative of a material issue other than character, the court must decide whether the probative value of the evidence is substantially outweighed by its potential prejudicial effect.

*United States v. Clay*, 667 F.3d 689, 692 (6th Cir. 2012).

The Government will satisfy the first step through the expected testimony of Emmons, from which "the jury [will be able] to reasonably conclude that the act occurred and the defendant

was the actor."[7]  *United States v. Bell,* 516 F.3d 432, 441 (6th Cir. 2008).

The Emmons 404(b) Evidence will be probative of central issues to all three charges.   The Emmons Testimony will show that Cole and her co-conspirator, in 2015, directed EAC client Emmons to lie to Polish officials about Emmons' wealth to mislead the Polish officials, fraudulently improve the prospects for the Emmons' adoption, and further EAC's adoption business in Poland.  This testimony is probative of, among other things, the following:

- Cole's intent in concealing from the State Department and COA her role in causing the relinquishment of Child 2 (as relevant to Count 11 and Count 12);

- Cole's knowledge and intent in causing (either directly or through Co-Conspirator 1) Poland Client to conceal from U.S. authorities the plan to immediately relinquish Child 2 (as relevant to Count 11);

- Cole's knowledge that Polish officials scrutinize the qualifications of U.S. prospective adoptive parents (as relevant to Count 13); and

- Cole's intent and absence of mistake in making false statements to the Polish Central Authority in the December 2016 Letter (as relevant to Count 13).

The Emmons 404(b) Evidence thus will be probative of material issues other than character.  Further, it "address[es] conduct substantially similar and reasonably near in time to the offenses for the defendant is being tried."  *United States v. Johnson*, 458 Fed. App'x 464, 470 (6th Cir. 2012).   The Emmons 404(b) Evidence is not unfairly prejudicial: it will not invite the jury to convict the defendant on account of conduct wholly separate from the charged crimes.  The jury will readily understand that Cole is charged with crimes arising from the Child 2 adoption, not the Emmons adoption, and the Court can instruct the jury accordingly.  *See United States v. Wright*, 16 F.3d 1429, 1443 (6th Cir 1994) (holding that the court minimized any potential prejudice arising

---

[7]     The Government provided Cole's counsel with a FBI memorandum describing an interview with Emmons, as well as other documents obtained from Emmons, as part of its Jencks Act production.

from the admission of prior crimes by giving a limiting instruction to the jury prior to admitting

the evidence).

### c. The Noticed Spiegel 404(b) Testimony Is Admissible to Show Intent and Absence of Mistake

The Government's second noticed Rule 404(b) evidence is the following:

> Cole instructed a former EAC employee, Rose Spiegel, to create a false and fabricated post-placement report to send to intercountry adoption authorities in Russia. Cole did so when EAC could not locate one of its former clients in the Russia program. Cole also often directed Spiegel to falsify post-placements to Russia in order to falsely make it appear as if EAC had provided its post-placement reports within the required time frame. Cole threatened Spiegel that she and others at EAC could lose their jobs if Spiegel did not make the requested falsifications (the "Spiegel 404(b) Evidence").

ECF 111.

The Government will show through Spiegel's testimony that the past bad acts encompassed by the Spiegel 404(b) Evidence occurred. [8] The Spiegel 404(b) Evidence will be probative of Cole's willingness to make false representations to foreign authorities to further her business, and her willingness and ability to direct others to do so. These issues are squarely implicated by Count 11, in which Cole, among other things, caused EAC clients to conceal from authorities their plan to relinquish Child 2; and by Count 13, in which Cole herself made false and fraudulent statements to the Polish Central Authority. [9]

---

[8]     The Government provided Cole's counsel with two FBI memoranda describing interviews with Spiegel as part of its Jencks Act production.

[9]     The Government recognizes that the Spiegel 404(b) Evidence, unlike the Emmons 404(b) Evidence: (i) arose in EAC's Russia program rather than its Poland program, and (ii) the Government cannot show that it occurred during the relevant period. Nevertheless, the Government submits that introducing this evidence would be appropriate under Sixth Circuit precedent, which provides that "where evidence of prior bad acts is admitted for the purpose of showing intent, the prior acts need not duplicate the instant charge, but need only be sufficiently

Cole's counsel is likely to contend that the Poland Client situation was a "black swan" event unlike any Cole had encountered.  Be that as it may, the Spiegel 404(b) Evidence is probative of whether Cole's response to that event—to engage in fraudulent conduct, to conceal her conduct, and to make false and fraudulent statements—was intentional and not the product of a mistake.  As with the Emmons 404(b) Evidence, any possibility of prejudice can be cured by a jury instruction before the jury receives the Spiegel 404(b) Evidence.

Moreover, the proposed 404(b) Evidence does not pose a risk of inflaming the jury based on alleged bad acts by Cole that are distinct from the charged crimes that the jury will assess: this is not, for example, a bad act of domestic violence introduced in a tax case.  Rather, the proposed 404(b) evidence is squarely in line with the crimes charged, and significantly probative of whether Cole committed them.  Further, the proposed 404(b) evidence also does not pose a risk of confusing the issues or causing undue delay because it will introduced through to relatively discrete witnesses.

### d.    Admissibility of Summary Exhibits

In accordance with established practice in the Sixth Circuit and other circuits, the Government intends to use in its case-in-chief summary charts detailing and organizing the Government's evidence, in conjunction with the testimony of a FBI Supervisory Special Agent and a FBI Financial Analyst.  These charts will summarize hundreds of pages of bank statements, EAC business records, toll records, and other business records and communications that have been produced in discovery.

The use of summary exhibits is permitted by Fed. R. Evid. 1006:

---

analogous to support an inference of criminal intent."  *United States v. Benton*, 852 F.2d 1456, 1468 (6th Cir. 1988).

> The contents of voluminous writings, recordings, or photographs may be presented in the form of a chart, summary or calculation. The originals, or duplicates, shall be made available for examination or copying, or both, by other parties at a reasonable time and place. The court may order that they be produced in court.

In *Scales*, a leading case on the use of summary charts which has been followed in courts across the country, the Sixth Circuit held:

> There is no requirement in Rule 1006 . . .that it be literally impossible to examine the underlying records before a summary or charts may be utilized. All that is required for the rule to apply is that the underlying "writings" be "voluminous," and that in-court examination not be convenient.

*Id.* at 562.  Other circuits have cited *Scales* as authority for upholding the admissibility of summary charts and summary testimony, where such summaries assisted the jury in organizing the proof and understanding the charges against the defendant.  In *United States v. Lemire*, 720 F.2d 1327, 1328 (D.C. Cir. 1983), *cert. denied*, 467 U.S. 1226 (1984), the court held that "a non-expert summary witness can help the jury organize and evaluate evidence which is factually complex and fragmentally revealed in the testimony of a multitude of witnesses throughout the trial."  The D.C. Circuit specifically rejected the defendant's contentions that a special agent was an improper summary witness because he was not an "expert," and that the summary witness provided an unwarranted second closing argument for the government.  In *United States v. Jennings*, 724 F.2d 436, 443 (5th Cir.), *cert. denied*, 467 U.S. 1227 (1984), the Fifth Circuit relied upon *Scales*, in holding that a special agent is qualified to present summary charts which do not contain complicated calculations requiring the need of an expert witness for accuracy.

The Government's proposed use of summary charts and summary witness testimony in this case will, consistent with the above-cited authority, assist the jury as finder of fact in organizing the proof and understanding the charges against Cole.   The summary charts, and the testimony of the witnesses concerning the charts, will be limited to evidence which is admissible or has been

admitted and has been made available to the defense for examination and copying.  In conjunction with the testimony of FBI Financial Analyst Alexander Chuna, the Government anticipates using summary charts to illustrate information contained in bank records and other financial records of EAC, Co-Conspirator 1, and a company controlled by Co-Conspirator 1.  In conjunction with the testimony of FBI Supervisory Special Agent R. Michael Massie, the Government anticipates using summary charts to illustrate information contained in phone records, text messages, emails, EAC business records, and other admitted or admissible evidence to assist the jury in organizing the proof and understanding the charges against the defendant.

> ### e.    Admission of Out-Of-Court Coconspirator Statements

The statements of a defendant's coconspirators during and in furtherance of the conspiracy, when offered by the Government, are not hearsay.  *See* Fed. R. Evid. 801(d)(2)(E).  The Indictment charges that, in Count 11, Cole conspired with Co-conspirator 1 and Debra Parris to defraud the United States.  The Government intends to offer statements made by Parris and Co-Conspirator 1 during and in furtherance of the conspiracy.  This evidence will include emails, text messages and other documents written by the co-conspirators, and witness testimony of statements made by the co-conspirators.  These statements will include, among others, statements made by Co-Conspirator 1 to Poland Client while in Poland to pressure and manipulate them to adopt both siblings in Poland while concealing their preparations to relinquish Child 2 in the United States.

A statement falls within the Rule 801(d)(2)(E) coconspirator exclusion if the Government shows "(1) that a conspiracy existed, (2) that [Defendant] was a member of the conspiracy and, (3) that the hearsay statement was made in the course and in furtherance of the conspiracy"—together, the *Enright* showing.  *See United States v. Benson*, 591 F.3d 491, 502 (6th Cir. 2010) (citing *United States v. Enright*, 579 F.2d 980, 986-87 (6th Cir. 1978)).

The Court determines whether the Government has proved these facts by a preponderance of the evidence under Federal Rule of Evidence 104(a). *See United States v. Tocco*, 200 F.3d 401, 420 (6th Cir. 2000). Accordingly, the Court "may consider hearsay" and other non-privileged evidence that would otherwise be inadmissible. *Bourjaily v. United States*, 483 U.S. 171, 178 (1987). The Court may even consider the statements sought to be admitted under Rule 801(d)(2)(E), *id.* at 181, though the Government must provide "sufficient independent and corroborating evidence" of the conspiracy, *United States v. Smith*, 320 F.3d 647, 654 (6th Cir. 2003). Courts in this Circuit commonly "admit the hearsay statements subject to a later ruling that the government has met its burden." *See id.*; *United States v. Lamar*, 466 F. App'x 495, 498 (6th Cir. 2012).

Here, the conspiracy's existence and Cole's membership will be well documented by the statements themselves and by ample corroborating evidence, including: witness testimony and corroborating emails showing the close coordination between Cole and Co-Conspirator 1 regarding the adoption in question specifically and EAC's Poland program generally; emails and documents showing Cole and Co-Conspirator 1's close coordination in drafting false statements to the Polish authorities; financial analysis of Cole and Co-Conspirator 1's extensive financial relationship; and witness testimony and corroborating emails and phone records showing the coordination between Cole and Parris in the adoption in question.[10]

The evidence will also show that the statements were "made in the course and in furtherance of the conspiracy." *See Wright*, 343 F.3d at 866. The conspiracy was ongoing

---

[10]    Parris pleaded guilty to this conspiracy charge. The Statement of Facts that she admitted to in her plea agreement states that the conspired with Cole. (ECF 97 at ¶ 20(p) ("[Parris] agreed to assist Cole to conceal the roles of Cole and [EAC] in causing the transfer of custody of Child 2 from Poland Client to Parris Relatives 1 and 2.")

throughout the period of the statements at issue, beginning at least as early as mid-June 2015 and continuing through at least December 2016.   Such statements "can take many forms," including efforts to conceal a scheme or statements or statements "not 'exclusively, or even primarily, made to further the conspiracy.'"  *Tocco*, 200 F.3d at 419 (citation omitted).  Moreover, the rule applies with equal force to conversations between a coconspirator and a third party, such as statements made by Co-Conspirator 1 to Poland Client.  *See United States v. Westmoreland*, 312 F.3d 302, 309-10 (7th Cir. 2002).

None of these coconspirator statements implicate any Confrontation Clause concerns because they are not testimonial in nature.  *See Crawford v. Washington,* 541 U.S. 36, 51 (2004) ("the Confrontation Clause . . . applies to witnesses against the accused—in other words, those who bear testimony").  Rule 801(d)(2)(E) coconspirator statements are "categorically non-testimonial and also within a 'firmly rooted' exception to the hearsay rule. Therefore, the Confrontation Clause does not bar their admission."  *United States v. Tragas,* 727 F.3d 610, 615 (6th Cir. 2013) (internal citations omitted).[11]  Accordingly, the Government submits that the proffered coconspirator statements are admissible under Rule 801(d)(2)(E).

### f.    Exclusion of "Good Acts" Evidence

Admission of a defendant's lawfulness and non-corrupt conduct is improper unless in the form of reputation or opinion evidence offered by character witnesses strictly in accord with the limitations of Federal Rule of Evidence 405(a).  Evidence of a defendant's "good acts," which is sometimes referred to as "reverse 404(b) evidence," is inadmissible.

---

[11]    The Government will not offer for their truth any statements made by Parris to Texas or federal law enforcement.

### 1. *Good Acts Evidence Is Irrelevant and Inadmissible*

Federal Rules of Evidence 404(a) permits the limited use of character evidence in defined circumstances. Rule 404(a)(1) renders admissible "evidence of a pertinent trait of character offered by an accused, or by the prosecution to rebut the same." Although Rule 404(a) does not define "character trait," the term has traditionally "refer[red] to elements of one's disposition, 'such as honesty, temperance, or peacefulness.'" *See United States v. West*, 670 F.2d 675, 682 (7th Cir. 1982). In this case, certain character traits may or may not be pertinent.

### 2. *Defendant's Methods for Proving Character*

Should Cole establish a basis for the admission of character evidence, Federal Rule of Evidence 405(a) governs the manner in which character may be proved. Generally, evidence of a defendant's character must be presented in the form of opinion or reputation testimony. It is impermissible for a defendant to seek to establish her innocence of the charged offenses through proof of the absence of criminal acts on other specific occasions. *See United States v. Daulton*, 266 F. App'x 381 (6th Cir. 2008) (citations and internal quotations omitted) ("Evidence of noncriminal conduct to negate the inference of criminal conduct is generally irrelevant."); *United States v. Camejo*, 929 F.2d 610, 613 (11th Cir. 1991) ("Evidence of good conduct is not admissible to negate criminal intent.").

Only when character "is an essential element of a charge, claim or defense"—which is not the case here—may the defendant introduce specific instances of conduct. *See* Fed. R. Evid. 405(b). Thus, Cole may not seek to elicit evidence that on prior occasions, she committed good acts. For example, it would be impermissible for Cole to seek to introduce evidence of good acts by cross-examining witnesses along the lines of, "Isn't it true that defendant did not do anything improper on this occasion?" or "Isn't it true defendant always treated you with respect?" or "Isn't it true that defendant was a hard worker?" To the extent Cole offers character evidence, she should

be permitted to do so only pursuant to Federal Rule of Evidence 405(a), which permits opinion or reputation testimony, not specific acts of good conduct.

To avoid surprise and possible error, it would be proper for the Court to require that the defense disclose any such evidence or argument in advance, in order to provide the Government an opportunity to object. Absent such notice, Cole should be barred from referring to specific "good acts" in opening statements. *See United States v. Kemp*, 362 F. Supp. 2d 591, 593-95 (E.D. Pa. 2005).

### 3. Rebutting Cole's Character Evidence

"Once the defendant has 'opened the door' by offering evidence as to his good character, the prosecution may rebut that evidence." *United States v. Clark*, No. 00-1743, 2001 WL 1631826 *3 (6th Cir. 2001) (citing *United States v. McGuire*, 744 F.2d 1197, 1204 (6th Cir. 1984)). The Supreme Court has long cautioned defendants on this issue:

> The price a defendant must pay for attempting to prove his good name is to throw open the entire subject which the law has kept closed for his benefit and to make himself vulnerable where the law otherwise shields him. The prosecution may pursue the inquiry with contradictory witnesses to show that damaging rumors, whether or not well-grounded, were afloat–for it is not the man that he is, but the name that he has which is put in issue. . . Thus, while the law gives defendant the option to show as a fact that his reputation reflects a life and habit incompatible with commission of the offense charged, it subjects his proof to tests of credibility designed to prevent him from profiting by a mere parade of partisans.

*United States v. Michelson*, 335 U.S. 469, 479 (1948).

While Cole is limited to opinion and reputation testimony to prove character, the Government may rebut that evidence through cross-examination of defense witnesses about specific instances of conduct and through testimony of character witnesses. *Id.* Should Cole put

forth evidence of good character in her defense, the Government intends to rebut such evidence through all means permissible under the Federal Rules of Evidence.

### g.    Limitation on Cole Seeking to Admit Her Own Out-Of-Court Statements

The Government intends to admit some of Cole's out-of-court statements for the truth of the matters asserted. In particular, the Government has obtained many statements that Cole made through emails and will also elicit testimony on Cole's statements to witnesses.  Out-of-court statements made by a party-opponent are excluded from the definition of hearsay under Federal Rule of Evidence 801(d)(2), but this exception does not apply when the same statements are offered by the party himself.  The party-opponent exception reflects the fact that the adversarial process allows the party-declarant to rebut his or her own admissions by testifying at trial. *See United States v. McDaniel*, 398 F.3d 540, 545 (6th Cir. 2005). This exception does not, however, extend to a party's attempt to introduce his or her own statements through the testimony of other witnesses. *See United States v. Payne*, 437 F.3d 540, 547-48 (6th Cir. 2006). Precluding a defendant from eliciting inadmissible hearsay statements does not violate the Confrontation Clause. *See United States v. Ford*, 761 F.3d 641 (6th Cir. 2014).  The Government thus respectfully requests that the Court prohibit Cole from introducing any of her out-of-court statements at trial through any witness other than herself.

### h.    The Jury Should Not Be Informed of the Consequences of Its Verdict

If convicted in this case, Cole faces, among other things, a possible term of imprisonment. Cole may endeavor to educate the jury on the potential ramifications of a guilty verdict in this case with the hope of obtaining jury nullification. The Sixth Circuit has firmly rejected such a strategy: "[U]nless juries have roles in sentencing, such as in capital sentencing proceedings, juries should be instructed not to consider defendants' possible sentences during deliberation." *United States v.*

*Chesney*, 86 F.3d 564, 574 (6th Cir. 1996); *see also United States v. Stotts*, 176 F.3d 880, 886 (6th Cir. 1999) ("the Supreme Court has held that juries should be instructed not to consider a defendant's possible sentence unless the jury has aspecific role in sentencing").  Accordingly, Cole should not be permitted to distract and confuse the jury by inviting the jury to consider sentencing issues when deciding the issue of guilt.

Respectfully submitted,

JOSEPH S. BEEMSTERBOER
ACTING CHIEF
FRAUD SECTION

s/ Jason M. Manning
JASON M. MANNING
ALEX KRAMER
Trial Attorneys
Fraud Section
1400 New York Avenue NW
Washington, D.C. 20005
(202) 514-6256/307-0955
Jason.Manning@usdoj.gov /
Alexander.Kramer@usdoj.gov

BRIDGET M. BRENNAN
UNITED STATES ATTORNEY
NORTHERN DISTRICT OF OHIO

s/ Chelsea S. Rice
CHELSEA S. RICE
Assistant United States Attorney
400 United States Court House
801 West Superior Avenue
Cleveland, Ohio 44113
(216) 622-3752
Chelsea.Rice@usdoj.gov