IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO.: 1:20CR424 |
| | ) | |
| | ) | JUDGE JAMES S. GWIN |
| | ) | |
| v. | ) | |
| | ) | |
| MARGARET COLE, | ) | GOVERNMENT'S SENTENCING |
| DEBRA PARRIS, | ) | MEMORANDUM AS TO DEFENDANT |
| DORAH MIREMBE, | ) | MARGARET COLE |
| | ) | |
| Defendants. | ) | |

Now comes the United States of America, by and through its counsel, Acting U.S. Attorney

for the Northern District of Ohio, Michelle M. Baeppler, and Acting Chief of the Department of

Justice, Criminal Division, Fraud Section, Joseph S. Beemsterboer, and submits the following

memorandum in aid of sentencing in this case.

Respectfully submitted,

JOSEPH S. BEEMSTERBOER          MICHELLE M. BAEPPLER
ACTING CHIEF                    ACTING UNITED STATES ATTORNEY
FRAUD SECTION                   NORTHERN DISTRICT OF OHIO

_____s/ Jason Manning_____          _____s/ Chelsea Rice_____
JASON M. MANNING                CHELSEA RICE
ALEX KRAMER                     Assistant United States Attorney
Trial Attorneys                 400 United States Court House
Fraud Section                   801 West Superior Avenue
1400 New York Avenue NW         Cleveland, Ohio 44113
Washington, D.C. 20005          (216) 622-3752
(202) 514-6256/307-0955         Chelsea.Rice@usdoj.gov
Jason.Manning@usdoj.gov /
Alexander.Kramer@usdoj.gov

The United States of America, through counsel, submits its position with respect to the appropriate sentence for Defendant Margaret Cole ("Cole").   The United States concurs with the Probation Officer's determination that Cole's Total Offense Level is 16 and her Criminal History Category is I.   Presentence Investigative Report ("PSR") ¶¶ 46-57, 60-65 (ECF 170).   Cole's applicable Guideline range is therefore 21 to 27 months imprisonment and a fine of $10,000 to $95,000.   *Id.* ¶ 86.   Based on the factors set forth in 18 U.S.C. § 3553(a) and for the reasons set forth below, the Government submits that a custodial sentence at the high end of the Guidelines range, together with a fine at the high end of the Guidelines range, would be appropriate here.

## I.      COLE'S OFFENSE CONDUCT

### a.   Cole's Criminal Charges

On August 13, 2020, a grand jury indicted Cole on three felony charges:

- Count 11: conspiracy to defraud the United States in violation of 18 U.S.C. § 371.

- Count 12: false statement to an accrediting entity, the Council on Accreditation, in violation of 42 U.S.C. § 14944.

- Count 13: false statement to an entity performing a central authority function, the Polish Central Authority, in violation of 42 U.S.C. § 14944.

ECF 1.   On February 4, 2022—less than a week before trial was scheduled to begin—Cole pleaded guilty to Counts 11 and 13.   ECF 160.   In her allocution, Cole also admitted that in furtherance of the conspiracy to defraud the United States, she caused the submission of the false April 2016 report to the Council on Accreditation.   Transcript, *United States v. Cole*, 20 Cr. 424

2

(Feb. 4, 2022) ("Plea Tr.") at 18:1-4.   Cole thereby acknowledged that she committed the crime

charged in Count 12 as well.[1]

### b.   The Regulation of Intercountry Adoption

Cole was the Executive Director of European Adoption Consultants ("EAC"), an Ohio-

based agency that conducted intercountry adoptions, by which prospective adoptive parents in the

United States would adopt orphans from overseas.   The United States Department of State ("State

Department") was the federal agency primarily responsible for regulating intercountry adoption,

which it did, in part, through a designated accrediting entity, the Council on Accreditation

("COA").   EAC was accredited by COA and subject to COA's oversight, and Cole certified

annually that EAC was in compliance with COA's rules and regulations.

The primary purpose of the regulation of intercountry adoption was to protect vulnerable

orphan children and ensure that intercountry adoption was conducted safely and ethically.

Critical protections to ensure the safety of intercountry adoption included a social worker's report

on the home in which the adoptee would be raised (the "home study"), which required criminal

background checks of the prospective adoptive parents.   Accredited agencies such as EAC were

also required to have policies prohibiting preferential treatment for friends and family of

employees because giving such preferential treatment could undermine the child's best interest.

### c.   The Poland Conspiracy

Cole organized an illegal scheme to cause an EAC client to take two children out of Poland

under false pretenses; to transfer one child upon arrival in the United States to unvetted relatives

---

[1]       The Government agreed to dismiss Count 12 in the plea agreement.   ECF 158 at ¶ 9.

of an EAC employee, Cole's co-conspirator Debra Parris; and to conceal this illegal transfer from the Polish and U.S. authorities responsible for ensuring the safety of intercountry adoption. Cole and her co-conspirators not only defrauded the authorities to cause the illegal transfer of a child; worse yet, Cole continued to lie to U.S. and Polish Authorities even after Parris's relatives horrifically abused the child. In sum, Cole's actions caused a vulnerable child to be placed into a dangerous home, and Cole and her co-conspirators made and a caused to be made a series of false and fraudulent statements about these actions, over at least a 17-month period, in an attempt to prevent U.S. and Polish Authorities from taking actions against Cole's agency.

The Government's evidence at trial would have shown the following:

In June and July 2015, Poland Clients travelled to Poland to pursue the adoptions of two Polish orphan siblings ("Child 1" and "Child 2") through EAC.[2] While in Poland, Poland Clients developed concerns as to whether they could adequately meet the physical and emotional needs of both Child 1 and Child 2, and they expressed that concern to Co-Conspirator 1, who was EAC's in-country representative in Poland (and, previously, EAC's representative in Russia). Cole and Co-Conspirator 1 were extremely close: they had worked together for more than 15 years, they communicated frequently by phone and email, and Cole paid Co-Conspirator 1's company hundreds of thousands of dollars a year. Co-Conspirator 1 pressured Poland Clients, telling them

---

[2]     For simplicity's sake, and to preserve the anonymity of uncharged individuals, "Poland Clients" is used herein to refer collectively to the husband and wife who adopted Child 1 and Child 2, and "Poland Client" to refer to one spouse individually when necessary to do so.

that if they did not adopt both siblings, the siblings would be "red-marked," unlikely to be adopted by anyone else, and they could potentially die in an institution.

Poland Clients, who had never adopted a child before, contacted Cole.  Poland Clients placed their trust in Cole and relied on Cole, as EAC's Executive Director who regularly touted her vast experience in international adoption, to guide them through the issues with Child 1 and Child 2.  In an email to Cole dated June 21, 2015, Poland Client described the concerns about raising both Child 1 and Child 2.  Poland Client expressed a strong desire to find another family to raise Child 2 and offered to travel to wherever in the United States that the other family resided to deliver Child 2.  After receiving no response from Cole, Poland Client emailed Cole again three days later and again expressed her intention not to keep custody of Child 2.  Poland Client wrote to Cole, "I just want to follow up from my last email to see if there is anything [we] need to be doing to make the process run more smoothly for the dissolution."

Poland Clients spoke to Cole multiple times from Poland.  It was clear to Poland Clients from those conversations that Cole and Co-Conspirator 1 were working closing together regarding Poland Clients' adoption.  Poland Clients briefly considered—but then, while still in Poland, decided against—temporarily placing Child 2 with a family living near where they lived in Utah. Poland Clients were clear with Cole 1 that they did not want to place Child 2 in temporary or foster care.  After Poland Clients made clear that they were not interested in temporary care for Child 2, Cole identified a few persons who would potentially adopt Child 2, including Parris Relatives 1 and 2, who lived in Texas.  It was Cole's idea to place Child 2 with Parris Relatives 1 and 2, and Cole intended from the outset that Parris Relatives 1 and 2 would permanently adopt Child 2.  *See* Ex. A, Plea Agreement, *United States v. Parris*, ¶¶ 21(h)-(m) (ECF 97) ("Parris Plea Agreement").

Poland Clients understood that EAC executive Parris was related to Parris Relatives 1 and 2, and that Parris expected that Parris Relatives 1 and 2 would permanently adopt Child 2.

On June 29, 2015, Poland Client emailed Cole, "We are hopefully coming home sometime this week and we need to make a plan . . . We both feel that we would prefer that [Child 2] is with [Parris Relatives 1 and 2] . . . Have [they] been working on their home study?"  Cole never responded to that question.  Poland Client believed, however, that any family recommended by Cole had been subjected to a background check and a home study and met the numerous other prerequisites for intercountry adoption.

On July 1, 2015, Poland Clients applied for visas for Child 1 and Child 2 and were interviewed at the U.S. Embassy in Warsaw, Poland.  Relying on directions from Co-Conspirator 1, Poland Clients did not mention that they had taken steps to transfer custody of Child 2 to another family upon arrival in the United States.  On July 2, 2015, Poland Clients obtained visas for both siblings.  Cole—who had been the Executive Director of an intercountry adoption agency for decades—knew that Poland Clients could not get Child 1 and Child 2 into the United States without obtaining visas for them.  Cole further knew that the U.S. State Department would not issue the visas if Poland Clients disclosed that they might transfer Child 2 to someone else, and that they had already taken steps toward doing so.

On July 4, 2015, Poland Clients traveled from Poland to Dallas/Fort Worth International Airport ("DFW") with Child 1 and Child 2.  On the advice of Parris, Poland Clients changed the flight arrangements they had previously made so that they would fly directly from Europe to Texas, thereby not bringing Child 2 across U.S. state lines, which Parris advised could cause issues.  At DFW, Poland Clients met Parris, who directed them to notarize documents permanently

6

relinquishing Child 2 to Parris Relatives 1 and 2.  Parris took Child 2 from Poland Clients, and thereafter Child 2 lived with Parris Relatives 1 and 2 in Texas.  Parris Relative 2 had a criminal arrest record, which would have been discovered had EAC obtained the required home study and criminal background check before transferring Child 2 to Parris Relatives 1 and 2.  EAC, however, had not obtained a home study or a criminal background check of Parris Relatives 1 and 2—although Cole knew that families pursuing intercountry adoptions from Poland were required to complete home studies and undergo background checks.

In the months following July 4, 2015, Cole did not inform the State Department, COA, or the Polish Central Authority that EAC had arranged the transfer of Child 2 to Parris Relatives 1 and 2.  Through emails and other communications with Parris, however, Cole knew that Parris Relatives 1 and 2 continued to have custody of Child 2 and that they intended to raise Child 2 permanently.  *See* Parris Plea Agreement at ¶¶ 21(m)-(n); Ex. F (email from Parris to Cole dated August 27, 2015).  Cole's choice to conceal the transfer of Child 2 to Parris Relatives 1 and 2 prevented COA and the Polish Authorities from knowing that the child was living in the home of an unvetted family.

Beginning in April 2016, Cole, over the course of at least nine months, made at least three separate false and fraudulent statements to domestic and foreign authorities to conceal her misconduct related to the transfer of custody of Child 2.  On April 18, 2016, Cole caused EAC to submit a false report to COA related to the "disruption / dissolution" of the adoption of Child 2 (the "April 2016 COA Report").  Plea Tr. at 18:1-4.  The April 2016 COA Report concealed Cole's role in the relinquishment of Child 2 and contained the following false statements, among others: (1) that Poland Client initially transferred Child 2 to Parris Relatives 1 and 2 for respite

(temporary) care; and (2) that the "disruption / dissolution" of the adoption of Child 2 occurred within 30 days of the report (on March 21, 2016), even though Parris Relatives 1 and 2 took permanent custody of Child 2 in July 2015 and completed the adoption of Child 2 under Texas law in February 2016. *See* Ex. B (April 2016 COA Report). The April 2016 COA Report also concealed that Parris Relatives 1 and 2 were the relatives of an EAC employee.[3] *Id.*

On August 10, 2016, a social services counselor in Texas ("Adoption Counselor"), learned that Child 2 had been injured. Adoption Counselor also learned that Child 2 had been placed into Parris Relative 1 and 2's home before they had completed a home study. On the morning of August 12, 2016, Adoption Counselor told Parris that she felt obligated to report that Child 2 had been injured and that Child 2 had been placed into an unvetted home. Parris called Cole later that morning. Adoption Counselor filed reports with local Texas authorities and COA.

Child 2 was taken to a children's hospital in Texas. Medical staff identified injuries in several areas of Child 2's body, including severe injuries to the genital region, which would require Child 2 to undergo multiple surgeries. Medical staff concluded that the injuries were sustained recently and could not have been self-inflicted. Child 2's case was referred to child protection authorities and to the Denton Police Department, which initiated an investigation. Detective David Bearden communicated with Cole during his investigation and made clear that the focus of his criminal investigation was on the recent, serious injuries that Child 2 had suffered in Texas, not Poland.

---

[3]  Trial evidence would have also shown that Cole submitted the April 2016 COA Report in the name of another EAC employee, who was wholly unaware of the report and only learned of it after she had quit EAC.

On September 2, 2016, Cole—who knew that Adoption Counselor would report Child 2's injuries to COA—reported Child 2's injury to COA (the "September 2016 COA Report"). The September 2016 COA Report was Cole's second false and fraudulent statement to authorities, and her first after Child 2 was abused. *See* Plea Tr. at 18:5-10. Cole again concealed that Parris Relatives 1 and 2 were Parris's relatives and that Cole had caused the transfer of Child 2 to them: Cole wrote, "[t]he family in question is not a EAC family." Ex. C (September 2016 COA Report). Cole also wrote that "the incident [the injuries to Child 2] appeared to have occurred in Poland." *Id.* Further, Cole falsely stated in the report that the injury occurred on August 30, 2016 (more than two weeks after Parris informed Cole of the injury), to fraudulently make it appear that EAC had complied with COA's requirement that any injury to a child be reported within 48 hours. *Id.*

On October 19, 2016, the Dallas Observer published an article titled, "Horrific Abuse Allegations Shock Denton as Texas Falls Under Scrutiny to Protect Kids" (The "Observer Article"). The Observer Article reported that Parris Relative 1 was arrested on charges of causing serious bodily injury to a child and that Parris Relative 2 had been charged as well. The Observer Article cited to an affidavit submitted in support of Parris Relative 1's arrest, which stated that Child 2 would "require several surgeries and a colostomy bag to correct the injuries she received."

On December 8, 2016, State Department personnel informed the Polish Central Authority that Child 2 had been physically abused. The Polish Central Authority further learned that Child 2 was abused while in the custody of Parris Relatives 1 and 2—who were not the U.S. adoptive parents that had been approved by the Polish Central Authority and by a Polish judge to adopt Child 2. Also on December 8, 2016, Co-Conspirator 1 forwarded Cole a link to the Observer

Article.   (The FBI found a hard copy of the Observer Article in Cole's office during a search in February 2017.)

On December 9, 2016, the Polish Central Authority informed Cole by email that EAC's accreditation in Poland had been suspended.   The Polish Central Authority also emailed EAC a letter in Polish, dated that same day and signed by Director Olgierd Podgorski (the "Podgorski Letter").   Co-Conspirator 1 emailed Cole an English translation of the Podgorksi Letter, which requested that EAC provide information explaining the "illegal transfer" of Child 2 to Parris Relatives 1 and 2, who it described as "not prepared for the role of adoptive parents" and "suspected of having committed a criminal act against [Child 2]."

Cole responded to the Podgorski Letter on December 11, 2016 (the "December 2016 Letter").   In writing the December 2016 Letter, Cole knew that Child 2 was reportedly abused in Texas, and that the Polish Authorities sought detailed information about Cole's role in placing Child 2 with the abusers.   Cole, again, chose to lie to the authorities: Cole falsely represented that Parris Relatives 1 and 2 took custody of Child 2 for temporary care; concealed that Parris Relatives 1 and 2 were related to an EAC employee; and concealed her role in Child 2's transfer to Parris Relatives 1 and 2.   *See* Ex. D (December 2016 Letter); Plea Tr. 19:8-19.   Cole also stated that Child 2's injuries likely originated in Poland and "likely no crime was committed" in Texas. Cole's motivation to lie here was clear: by 2016, Poland accounted for more than 40% of the money coming into EAC, and Cole knew that, if the Polish Central Authority discovered Cole's role in placing Child 2 with the abusers, EAC would have no chance of getting its accreditation in Poland reinstated.

10

### d.  Cole's Pattern of Defrauding Adoption Authorities

Cole and Co-Conspirator 1's willingness to defraud adoption authorities, and to pressure Poland Client into concealing their plan from the authorities, was not anomalous. Rather, the evidence at trial would have shown that Cole directed clients and employees to make false statements to foreign officials, including to a Polish judge, when Cole believed it would improve her chances of completing more adoptions or was necessary to falsely represent that EAC had complied with applicable requirements.   The Government was prepared to introduce evidence at trial showing that in approximately 2015, Cole and Co-Conspirator 1 instructed another client in EAC's Poland program to tell specific, scripted lies to a Polish court in order (in Cole's view) to improve the likelihood that the Polish court would grant that client's adoption. When that client told Cole that she refused to do so, Cole reprimanded her and told her she was putting EAC's business in Poland at risk.   ECF 137 (denying Cole's motion to exclude proposed 404(b) evidence).   Further, the Government was prepared to introduce evidence at trial showing Cole instructed an EAC employee to create false and fabricated post-placement reports to send to intercountry adoption authorities in Russia, and Cole threatened the employee that she and others at EAC could lose their jobs if she did not make the requested falsifications.   *Id.*

### e.  Other Information To Be Used In Imposing Cole's Sentence

Section 1B1.4 of the Sentencing Guidelines provides, "[i]n determining the sentence to impose within the guideline range, or whether a departure from the guidelines is warranted, the court may consider, without limitation, any information concerning the background, character and conduct of the defendant, unless otherwise prohibited by law."   U.S.S.G. §1 B1.4 (citing 18 U.S.C. § 3661).   In addition to the offense conduct described above, two aspects of Cole's

11

conduct as EAC's Executive Director warrant consideration: Cole's responsibility for EAC's foreign bribery, visa fraud, and wire fraud crimes in EAC's Uganda program, to which two of EAC's employees pleaded guilty; and EAC's financial misconduct, for which Cole and EAC entered into a consent decree with the Ohio Attorney General that effectively shuttered EAC.

### i.  Cole's Responsibility for EAC's Uganda Crimes

For at least three years, from approximately 2014 through approximately 2016, EAC and its Ugandan agent, Defendant Dorah Mirembe, engaged in systematic bribery of Ugandan judges and other Ugandan officials.[4]   EAC and Mirembe further committed extensive visa fraud by causing EAC's clients to submit false and fraudulent information to the U.S. State Department, and they committed wire fraud in concealing from EAC's clients that their money was being used to pay bribes in Uganda.   Parris and Robin Longoria, the co-heads of EAC's Uganda program, accepted responsibility for this conduct and pleaded guilty.   *See* Parris Plea Agreement; Plea Agreement, *United States v. Longoria*, 19 Cr. 482 (ECF 16).   In connection with Longoria's sentencing, the Court has received extensive information about the harm done to victims by EAC's Uganda program.[5]

The Government did not charge Cole with crimes related to the Uganda program.   The evidence developed in the investigation, however, showed at minimum that Cole had direct contact with Mirembe and signed EAC's adoption service agreement with Mirembe; Cole authorized the payments to Mirembe that were in fact payments to promote foreign bribery; and, according to

---

[4]     Mirembe remains at large.

[5]     Longoria was sentenced on March 23, 2022, to one year and a day imprisonment and one year of supervised release.   Parris is scheduled to be sentenced on July 7, 2022.

more than a dozen former EAC employee witnesses, Cole generally controlled all aspects of EAC's operations.

Moreover, in 2016, a former EAC client ("Uganda Client") repatriated the Ugandan child she had adopted through EAC, following Uganda Client's determination that the child was not in fact an orphan but, rather, the child's birth mother had been manipulated into giving up her child based on false pretenses.[6]  The evidence developed in the investigation shows that Cole, upon learning of this situation, did not undertake any internal investigation or review of EAC's Uganda program—as would be expected from any responsible adoption agency director whose employees or agents have allegedly committed serious misconduct.  Rather, according to information Uganda Client provided to the Government, Cole told third parties that Uganda Client and her family were to blame.

### ii.  Cole's Responsibility for EAC's Financial Misconduct

A civil action by the State of Ohio indicates that Cole, as EAC's Executive Director, also committed financial fraud.  The Ohio Attorney General brought a civil action against Cole and EAC on June 1, 2017, alleging that Cole and EAC had, in violation of Ohio law, unlawfully failed to refund money owed by EAC to former clients, and committed fraud in fundraising activities. *See* Complaint, *State v. European Adoption Consultants*, 17 CV 881099 (Cuyahoga Co. C.P. June 1, 2017).  On July 24, 2019, Cole and EAC entered a consent judgment with the Ohio Attorney General (the "Ohio AG Consent Decree").  The Ohio AG Consent Decree required EAC to cease

---

[6]  The Government does not allege that EAC knowingly caused Mirembe and her associates to manipulate Ugandan birth mothers but, rather, that EAC's willingness to engage in fraud and bribery with Mirembe and her associates opened the door to this conduct.

all operations and, within the State of Ohio, the Ohio AG Consent Decree permanently enjoined Cole from incorporating any non-profit organization, serving on the board of directors of any non-profit organization, or acting as a volunteer, agent, or employee of any charitable organization in a capacity that overseas, manages, or handles any charitable assets.   Ex. E ("Ohio AG Consent Decree").   The Ohio AG Consent Decree also established that Cole and EAC were jointly and severally liable to pay $260,000 in restitution and $37,500 in a civil penalty.   *Id.*

Evidence obtained in the Government's investigation showed Cole's role in causing EAC not to refund money owed to former clients after the State Department debarred EAC, as alleged by the Ohio Attorney General.   Specifically, a former longtime EAC employee stated to the FBI that she quit EAC because Cole directed her not to refund moneys owed to clients.

## II.     APPLICABLE LEGAL STANDARDS

As the Court is well aware, in *United States v. Booker*, 125 S. Ct. 738 (2005), the Sentencing Guidelines were rendered advisory for all criminal cases, and district courts were given enhanced discretion in the sentencing of criminal defendants.   *United States v. Jackson*, 408 F.3d 301, 304 (6th Cir. 2005).   Nonetheless, to secure nationwide consistency, "the [Sentencing] Guidelines should be the starting point and the initial benchmark."   *United States v. Gall*, 128 S. Ct. 586, 596-97 (2007); *United States v. Lalonde*, 509 F.3d 750, 763 (6th Cir. 2007).   "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range."   *Id.* (citing *United States v. Rita*, 127 S. Ct. 2456, 2465 (2007)) (observing that Congress mandated that the United States Sentencing Commission write sentencing guidelines that would carry out the objectives of 18 U.S.C. § 3553(a)).   *See* 28 U.S.C. § 991(b).   A court may find facts by a preponderance of the evidence when calculating the appropriate guidelines range.   *United*

14

*States v. Gates*, 461 F.3d 703, 707-08 (6th Cir. 2006).

Once the Guidelines have been considered, the court should, after giving both parties an opportunity to argue for whatever sentence they deem appropriate, consider all the Section 3553(a) factors and "make an individualized assessment based on the facts presented." *Gall*, 128 S. Ct. at 596-97.  A district court must provide a reasonable explanation of its application of the Section 3553(a) factors in imposing sentence.  In *United States v. Blackwell*, the Sixth Circuit held:

> The job of the district court is to impose "a sentence sufficient, but not greater than necessary, to comply with the purposes' of section 3553(a)." In reaching a sentence that complies with the purposes of § 3553(a), the district court must consider the Sentencing Guidelines range and all relevant § 3553 factors.  While a district court need not explicitly reference § 3553 or recite a list of factors, it must provide a reasoned explanation for its choice of sentence and its explanation must be sufficiently thorough to permit meaningful appellate review . . .

459 F.3d at 739, 773 (6th Cir. 2006) (citations omitted).

## III.    SENTENCING GUIDELINES

The Government concurs with the Probation Officer's determination that Cole's Total Offense Level is 16.  PSR ¶¶ 46-57.  The Government submits that the following calculation, using the current advisory Sentencing Guidelines Manual, represents the correct computation of the applicable offense level.[7]

---

[7]       Cole can argue for a different computation under the plea agreement.   ECF 158 at ¶ 17.

15

| Conspiracy to Defraud the United States and False Statement to Polish Central Authority | | |
|---|---|---|
| Base offense level | 6 | § 2B1.1(a)(2) |
| Substantial part of scheme overseas / sophisticated means | +2 | § 2B1.1(b)(10) |
| Increase to level 12 required by enhancement | +4 | § 2B1.1(b)(10) |
| Vulnerable victim | +2 | § 3B1.1(c) |
| Organizer / leader in criminal activity | +2 | § 3B1.1(c) |
| Abuse of Position of Trust or Special Skill | +2 | § 3B1.3 |
| **Subtotal** | **18** | |
| Acceptance of responsibility[8] | -2 | § 3E1.1(a) |
| **Total** | **16** | |

### a. The Conspiracy Led By Cole Was Substantially Carried Out Overseas

Section 2B1.1(b)(10)(B) provides for a two-point enhancement, and an automatic escalation to offense level 12, where "a substantial part of a fraudulent scheme was committed from outside the United States." U.S.S.G. § 2B1.1(b)(10)(B). Here, Cole and her co-conspirators carried out a criminal scheme with the following components:

- Cole and her co-conspirators caused EAC clients, while in Poland, to adopt two Polish orphans under Polish law through Polish court proceedings;

- Cole and her co-conspirators caused EAC clients to obtain U.S. visas for the two Polish orphans from the U.S. Embassy in Poland by concealing, during an interview in Warsaw, their plans to give away one of the Polish orphans; and

- Cole and her co-conspirators concealed the scheme from the Polish Central Authority for more than a year and, when it was discovered, Cole sent the false and fraudulent December 2016 Letter to the Polish Central Authority.

---

[8] Under Section 3E1.1, the Government has discretion to move for an additional one-level reduction if, among other things, the defendant "timely notif[ies] authorities of [her] intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently." U.S.S.G. § 3E1.1. Here, the Government declines to move for the one-level reduction. Cole pleaded guilty just a week before trial, more than 17 months after she was indicted. She therefore did not permit the Government to avoid trial preparation or allocate its resources efficiently.

Simply put, Cole and her co-conspirators could not have arranged for the transfer of Child 2—a Polish child living in Poland—to Parris Relatives 1 and 2 without Poland Client being in Poland to adopt Child 2 under Polish law and obtain a visa for Child 2.    Thus, "a substantial part of [the] fraudulent scheme was committed from outside the United States."    U.S.S.G. § 2B1.1(b)(10)(B).

This enhancement serves to increase the potential penalty for fraud schemes that are more difficult to investigate and prosecute because, by virtue of being schemes substantially carried out overseas, the Government faces the additional hurdle of obtaining foreign evidence to prove the crimes.    The Government was required to request records from Poland and conduct interviews in Poland to investigate the case, and at trial the Government intended to rely on a witness testifying by videoconference from Poland.    *See* ECF 139.    Application of the enhancement is thus appropriate here.

Cole participated in the conspiracy from Ohio while coordinating with Co-Conspirator 1, who was in Poland.    That Cole herself did not travel overseas to carry out the conspiracy is irrelevant under established precedents.    Courts have repeatedly applied the enhancement where, as here, a defendant participated from the United States in a conspiracy in which a substantial part of a fraudulent scheme was committed from outside the United States.    In *United States v. Williams*, the Eleventh Circuit Court of Appeals held:

> When determining if a substantial portion of the fraud took place outside the United States, we look at the overall scheme itself, not just the individual conduct of the participants. . . This is in large part because the actions of co-conspirators can be imputed to each of the other conspirators, so long as their actions were within the scope of the agreed conspiracy.    The scheme does not need to originate from outside the United States, and the defendant does not need to take action outside the United States for the enhancement to apply.

838 F. App'x 493, 495 (11th Cir. 2020).    The court upheld the application of the enhancement

against the defendant who operated within the United States and coordinated with co-conspirators

in Jamaica.    *Id.; see also, United States v. Arnaout*, 431 F.3d 994, 998–99 (7th Cir. 2005)

(upholding enhancement for scheme substantially carried out overseas where defendant operated

in the United States but conspiracy involved diverting money overseas); *United States v. King*, 623

F. App'x 962, 968 (11th Cir. 2015) (same).    The same result should be reached here.[9]

### b.  The Conspiracy Involved Sophisticated Means

The two-point enhancement pursuant to § 2B1.1(b)(10), and automatic escalation to

offense level 12, is also appropriate here for the independent reason that the scheme "involved

sophisticated means and the defendant intentionally engaged in or caused the conduct constituting

sophisticated means."    U.S.S.G. § 2B1.1(b)(10)(C).    Application Note 9 to the Commentary to

U.S.S.G. § 2B1.1 states that "sophisticated means" refers to "especially complex or especially

intricate offense conduct pertaining to the execution or concealment of an offense."    Accordingly,

the enhancement may be applied if a defendant employed sophisticated means in committing the

offense or evading detection. *See United States v. Jackson,* 346 F.3d 22 (2d Cir. 2003).    Here, the

---

[9]      In another federal conviction related to intercountry adoption, the court declined to apply
the Section 2B1.1(b)(10)(B) enhancement where the conviction arose from false statements made
to a U.S. authority (COA) that concealed financial transactions made in the U.S.  *See United
States v. Mooney*, 761 F. App'x 213, 216 (4th Cir. 2019).    The U.S.-centered conduct in *Mooney*
is readily distinguishable from the instant case, which arises from a fraudulent scheme in which
Cole and a Poland-based co-conspirator caused Poland Client, while in Poland, to complete an
adoption of Polish children in Poland under false pretenses and to fraudulently obtain visas from
the U.S. Embassy in Warsaw, Poland.    Cole then tried to cover up her crimes—and committed an
additional substantive crime—by making a false statement to the Polish Central Authority.    There
was no similar, substantial part of the fraudulent scheme committed from outside the United States
in *Mooney.*

Probation Officer correctly determined that this enhancement is warranted.

Intercountry adoption is highly regulated, and both the United States and Poland are parties to the Hague Convention, which sets forth extensive procedural requirements for U.S. parents adopting Polish orphans.   Thus, to carry out the scheme, and to have it remain undetected for more than a year—until Child 2 was abused and hospitalized, and Adoption Counselor reported the situation to COA—Cole and her co-conspirators employed the following sophisticated means:

- Causing Poland Clients to complete legal proceedings in Poland;

- Causing Poland Clients to obtain visas from the U.S. Embassy in Warsaw while concealing the scheme;

- Causing Poland Clients to re-route their flights to avoid bringing Child 2 across state lines before relinquishing custody of the child;

- Concealing from COA, despite COA's ongoing reporting requirements, the conspirators' role in transferring Child 2 to Parris Relatives 1 and 2; and

- Arranging for a notary and an attorney in Texas to memorialize the transfer of Child 2 to Parris Relatives 1 and 2 under Texas law.

The sophisticated means enhancement applies "when the offense conduct, viewed as a whole, was notably more intricate than that of the garden-variety offense." *United States v. Adejumo,* 772 F.3d 513, 533 (8th Cir. 2014).   A criminal scheme involving international travel, evasion of adoption authorities on two continents, completion of legal proceedings in a foreign country under false pretenses, and deceptive conduct toward the U.S. State Department, certainly is "more intricate than a garden-variety offense."   Cole, as the scheme's primary architect, caused and directed much of this sophisticated conduct.   The sophisticated means enhancement is warranted here.

### c.   Cole Proximately Caused Harm To A Vulnerable Orphan

The vulnerable victim enhancement applies where the defendant "knew or should have

known of the vulnerability" of the victim.    *United States v. Patel*, 485 Fed. Appx. 702, 719 (5th Cir. 2012).    A "vulnerable victim" is defined as "a person (A) who is a victim of the offense of conviction and any conduct for which the defendant is accountable under § 1B1.3 (Relevant Conduct); and (B) who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct."    U.S.S.G. § 3A1.1, App. N. 2.    The enhancement under subsection (b)(1) requires a finding of only one unusually vulnerable victim. *See United State v. Anderson* 440 F.3d 1013, 1017 (8th Cir. 2006).

Cole, after decades of work in intercountry adoption, knew that orphans are unusually vulnerable because of their age and their circumstances, and that their susceptibility to being trafficked and abused is one of the driving factors behind the applicable adoption regulations. Child 2 is a victim of Cole's conduct because Cole caused Child 2 to be placed in the home of unvetted adults—one of whom had a criminal record—outside of the regulatory protections that Cole circumvented.   Further, Child 2 is a victim of Cole's conduct because in defrauding the United States and lying to U.S. and Polish Authorities, Cole prevented any of those authorities from uncovering the illegal transfer of Child 2 to Parris Relatives 1 and 2 until after Child 2 was horrifically abused in their custody.   Child 2 is thus a victim of Cole's crimes, and the two-point enhancement applies accordingly.

In sentencing former EAC employee Longoria, the Court applied the vulnerable victim enhancement to the bribery, visa fraud, and wire fraud conspiracy to which she pleaded guilty. ECF 30, 38, *United States v. Longoria*, 19 Cr. 482 (N.D. Oh.)   Although foreign officials, U.S. officials, and EAC clients were the objects of the bribery, visa fraud, and wire fraud crimes, Longoria's conduct placed at risk and harmed the Ugandan orphans at issue, and thus the

20

enhancement was warranted.   The same reasoning applies here.

### d.   Cole Organized and Led the Conspiracy

Section 3B1.1(c) provides for a two-point enhancement "[i]f the defendant was an organizer, leader, manager, or supervisor in any criminal activity."   U.S.S.G. § 3B1.1(c).   Cole organized and led the conspiracy to defraud the United States.   Poland Client turned to Cole, as EAC's Executive Director, to address the challenges Poland Client encountered in Poland.   Cole then organized the criminal scheme: Cole identified Parris Relatives 1 and 2 as a family that could take Child 2; Cole introduced Parris to Poland Clients; Cole arranged for the illegal transfer of Child 2 to Parris Relatives 1 and 2; Cole ensured that EAC originally did not disclose its conduct to the State Department, COA, or the Polish Authorities; and Cole then told false statements to those authorities to cover up the criminal scheme.

Not only did Cole organize and lead the criminal scheme, but Cole was the supervisor and manager of her co-conspirators.   Co-conspirator 1 (and the company she led) worked for Cole and Cole paid her hundreds of thousands of dollars a year.   Cole's other co-conspirator, Debra Parris, was a salaried EAC employee, and Cole recruited her into the criminal scheme by proposing that Parris Relatives 1 and 2 take Child 2.   Neither Co-Conspirator 1 nor Parris would have, or could have, caused the transfer of Child 2 to Parris Relatives 1 and 2 without having been directed by Cole, EAC's founder and Executive Director.   The Sixth Circuit has upheld the application of Section 3B1.1(c) where, as here, the defendant recruited a co-conspirator into the conspiracy and directed a subordinate employee in the conspiracy.  *United States v. Carter*, 385 F. App'x 460, 467 (6th Cir. 2010) (upholding Section 3B1.1(c) enhancement where defendant received most of the funds, recruited a co-conspirator, and planned the fraud scheme); *United States v. Braxton*, No.

21

20-1491, 2022 WL 910571, at *6 (6th Cir. Mar. 29, 2022) (upholding Section 3B1.1(c) enhancement where defendant supervised a co-conspirator); *see also* U.S.S.G. § 3B1.1(c) comment. (n.4) (providing that "the exercise of decision-making authority, the nature of participation in the commission of the offense, [and] the recruitment of accomplices. . ." are factors to be considered under Section 3B1.1(c)).

Moreover, many former EAC employees were prepared to testify at trial that Cole controlled EAC's reporting to COA, the State Department, and the Polish Central Authority.   Cole was responsible for concealing the illegal transfer from those authorities and then making, and causing EAC to make, false and fraudulent statements to those authorities.   The two-point enhancement provided by Section 3B1.1(c) is commensurate with Cole's leading role in the criminal conspiracy.

### e.  Cole Abused the Special Position of Trust She Held as the Executive Director of An Accredited Adoption Service Provider

Section 3B1.3 provides for a two-point enhancement "[i]f the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense."    U.S.S.G. § 3B1.3.   Application Note 1 provides:

> "Public or private trust" refers to a position of public or private trust characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference). Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature.

U.S.S.G. § 3B1.3, comment. (n. 1).   Cole committed her crimes while serving as EAC's Executive Director, exercising significant managerial discretion over all EAC's operations.   Simply put, once Cole organized the conspiracy to cause Poland Client to transfer Child Relatives 1 and 2,

22

there was nobody at EAC who could stop her.

Moreover, EAC's clients, as well as the State Department and COA, placed their trust in Cole to adhere to applicable rules and regulations. Cole, as the Executive Director of an accredited adoption agency, was required by law to sign annual certifications for COA attesting that EAC was in substantial compliance with federal adoption regulations. 22 C.F.R. § 96.66(c). Cole, however, falsely certified that EAC was in compliance, and Cole provided false and fraudulent statements to COA. Cole thus violated the trust placed in her by COA, which accredited EAC on behalf of the State Department.

Cole also abused the trust placed in her by the Polish Central Authority. Foreign countries that are signatories to the Hague Convention depend on U.S. adoption service providers to follow applicable U.S. laws that implement the treaty. These countries allow U.S. adoption service providers to coordinate intercountry adoptions of their vulnerable orphans with the expectation that the adoptions will be performed safely and ethically. Cole, by concealing from the Polish Central Authority that she had organized a plan to have a Polish child given to an unvetted U.S. family, abused that trust.

Perhaps most importantly, Cole also abused the trust placed in her by Poland Client, who reasonably expected that Cole would follow the rules and looked to her because of her experience in international adoption. This is the essence of the abuse of trust enhancement: "[t]he trust relationship arises when a person or organization intentionally makes himself or itself vulnerable to someone in a particular position, ceding to the other's presumed better judgment some control over their affairs." *United States v. Freeman*, 86 F. App'x 35, 37–38, 43 (6th Cir. 2003). Further, the Sixth Circuit has frequently upheld the application of the two-point enhancement for

23

abuse of trust in sentencing defendants who, like Cole, abused their positions as senior officials at non-profit organizations.  *See United States v. Madison*, 226 F. App'x 535, 550 (6th Cir. 2007); *Freeman*, 86 F. App'x at 37–38, 43.  The abuse of trust enhancement should be applied here.

## IV.    APPLICATION OF THE SECTION 3553(a) FACTORS

The sentencing factors set forth in 18 U.S.C. § 3553(a) support a sentence at the high end of the Guidelines range.  The Government submits that the factors most germane to the sentencing determination here are the nature and circumstances of the offense, the need to promote respect for the law, and the need to provide general deterrence.  Further, none of the other Section 3553(a) factors, including those that Cole believes should be mitigating, warrant a sentence lower than a high Guidelines range sentence.

### a.  Nature and Circumstances of the Offense

In carrying out the fraudulent scheme, Cole abused her position as the head of an intercountry adoption agency and jeopardized the safety of a vulnerable child.  Cole did so because she prioritized the growth of EAC's Poland program, and the revenue to EAC and Co-Conspirator 1's company, over the safety of orphans and over adherence to governing federal regulations.  The charged crime was not a single error in judgment; rather, as set forth *supra*, Cole and her co-conspirators created an elaborate plan involving co-conspirators in Poland and the United States, and then made and caused to be made a series of false and fraudulent statements to multiple authorities over at least 17 months— a period spanning the horrific injury to Child 2.

Cole's crimes caused significant harm to real people and to important governmental interests.  Moreover, Cole's conduct leading to the charged crimes was not aberrant: rather, as the Government was prepared to show at trial, Cole previously directed clients to lie to foreign

24

officials, including foreign judges, and directed her employees to create false and fraudulent documents to send to foreign officials as well, all to maximize EAC's business.    *See* Section I(d), *supra.*

### b. Seriousness of the Offense, Promote Respect for the Law; Provide Just Punishment

Imposing a sentence at the high end of the range suggested by the Guidelines would reflect the seriousness of Cole's offense, promote respect for the law, and provide just punishment. Cole's crimes, at their core, constituted a blatant disregard for the regulatory protections meant to ensure the safety of intercountry adoption.   Like most regulated undertakings, intercountry adoption depends to a degree on the trust placed in its participants: accrediting entities like COA trust adoption agency directors, like Cole, to certify honestly their compliance with the rules; adoptive parents, like Poland Client, trust accredited adoption professionals to guide them in following those rules; foreign governments that allow Americans to adopt their orphans trust the U.S. authorities to ensure the adoptions will be performed safely and ethically.   Where, as here, that trust is abused and real damage is done, it is incumbent upon the Court to send a strong, clear message to the public that such a violation of the collective trust cannot and will not be tolerated.

### c. The Need for General Deterrence

The need to establish general deterrence is imperative here.   Cole's agency, EAC, was the first intercountry adoption agency ever debarred by the State Department.   Current and would-be intercountry adoption providers will undoubtedly pay heed to the message sent by her criminal sentence.   A significant sentence of imprisonment will convey that committing fraud in intercountry adoption—and thereby placing vulnerable orphans and adoptive parents at risk—

could result in not just an administrative sanction or fine but a meaningful prison term.

Courts have consistently recognized the general deterrence value of criminal penalties for white-collar crime. *See United States v. Peppel*, 707 F.3d 627, 637 (6th Cir. 2013) (noting that general deterrence is particularly effective in cases involving economic and public corruption crimes). "Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (citations omitted); *see also* S. REP. 98-225, at 76 (legislative history of § 3553 notes that deterrence is "particularly important in the area of white-collar crime"). These principles are particularly apposite here, where general deterrence is necessary to ensure adherence to laws meant to protect vulnerable children.

### d.  None of the Other Factors Warrant a Below Guidelines Sentence

None of the other Section 3553(a) factors cut against a sentence at the high end of the guidelines range. By virtue of EAC being debarred by the State Department and Cole and EAC being shuttered by the Ohio Attorney General, there no longer appears to be a significant need to protect the public from potential future misconduct by Cole. Yet the need for general deterrence, not specific deterrence, is paramount here.

The Government does not dispute that Cole's work with EAC likely has benefited many adoptive parents and adoptive orphans. The assessment of the history and characteristics of the Defendant, however, must also include the instant crimes, as well as Cole's responsibility for EAC's extensive criminal conduct in its Uganda program (as alleged in the criminal charges against Longoria and Parris, resolved by felony guilty pleas) and EAC's financial misconduct (as alleged in the Ohio Attorney General's lawsuit, resolved by consent decree).

26

Further, another notable characteristic of the Defendant, for sentencing purposes, is her attempt to evade responsibility.   While it is true that Cole has, at this point, pleaded guilty, she did so nearly eighteen months after indictment, on the eve of trial.   To this day, Cole continues to place the blame on everyone else, claiming "unfair treatment" from the State Department (PSR ¶ 84) without acknowledging that her actions, including her criminal conduct, led to the State Department debarment and the Government's investigation.   Indeed, even in her written statement to Probation, Cole continues to minimize her criminal wrongdoing.   PSR ¶ 45.

Cole may point to her lack of prior convictions.   Her lack of criminal history, however, is a component of the Guidelines calculation, and thus does not merit a downward variance. Similarly, Cole's health issues, including a benign tumor, anxiety about the prospect of imprisonment, and other conditions, while not *de minimis*, also do not counsel for a downward variance or departure.   PSR ¶¶ 80-84.   Cole has not shown that she any "extraordinary physical impairment" that would not be manageable by the Bureau of Prisons.   U.S.S.G. § 5H1.4; *see also Himmel v. United States*, No. 5:17 CR 120, 2019 WL 2928924, at *1 (N.D. Ohio July 8, 2019) (court rejected defendant's requested two-level reduction based on medical conditions that were not "anything other than what can be certainly attended to at the Bureau of Prisons").

## V.    ASSESSMENT OF A FINE

When considering whether to impose a fine, the court should consider, in addition to the factors set forth in Section 3553(a):

> (1) the defendant's income, earning capacity, and financial resources;

> (2) the burden that the fine will impose upon the defendant, any person who is financially dependent on the defendant, or any other person (including a government) that would be responsible for the welfare of any person financially dependent on the defendant,

relative to the burden that alternative punishments would impose;

(3) any pecuniary loss inflicted upon others as a result of the offense;

(4) whether restitution is ordered or made and the amount of such restitution;

(5) the need to deprive the defendant of illegally obtained gains from the offense;

(6) the expected costs to the government of any imprisonment, supervised release, or probation component of the sentence; [and]

(7) whether the defendant can pass on to consumers or other persons the expense of the fine.

18 U.S.C. § 3572(a).    Here, Cole currently reports net worth of $483,606, which provides ample resources to pay a Guidelines fine of $95,000.    PSR ¶ 90.   Further, the pecuniary losses to EAC's former clients have been tremendous, yet restitution cannot be reliably calculated for the crimes charged.    A fine is also warranted to deprive the defendant of illegally obtained gains and to further strengthen the deterrent effect of the sentence.    Thus, a fine at or near the top of the guidelines range should be imposed.

## VI.    CONCLUSION

For the reasons stated above, the United States submits that that a custodial sentence at the high end of the Guidelines range, as well as a fine at the high end of the Guidelines range, properly

accounts for each of the factors set forth in 18 U.S.C. § 3553(a).

Respectfully submitted,

JOSEPH S. BEEMSTERBOER                    MICHELLE M. BAEPPLER
ACTING CHIEF                              UNITED STATES ATTORNEY
FRAUD SECTION                             NORTHERN DISTRICT OF OHIO

_____ s/ Jason Manning _____         _____ s/ Chelsea Rice _____
JASON M. MANNING                          CHELSEA RICE
ALEX KRAMER                               Assistant United States Attorney
Trial Attorneys                           400 United States Court House
Fraud Section                             801 West Superior Avenue
1400 New York Avenue NW                   Cleveland, Ohio 44113
Washington, D.C. 20005                    (216) 622-3752
(202) 514-6256/307-0955                   Chelsea.Rice@usdoj.gov
Jason.Manning@usdoj.gov /
Alexander.Kramer@usdoj.gov