1  UNITED STATES DISTRICT COURT
   FOR THE NORTHERN DISTRICT OF OHIO
2            EASTERN DIVISION

3            - - - - -

4

5  UNITED STATES OF AMERICA,        )
                                    )
6            Plaintiff,             ) Case No. 1:20CR424
                                    )
7        vs.                        )
                                    )
8  MARGARET COLE,                   )
                                    )
9            Defendant.             )

10

11           - - - - -

12

13  TRANSCRIPT OF PROCEEDINGS HAD BEFORE THE HONORABLE

14    JUDGE JAMES S. GWIN, JUDGE OF SAID COURT,

15       ON THURSDAY, MAY 19TH, 2022,

16     COMMENCING AT 10:00 O'CLOCK A.M.

17           - - - - -

18

19

20

21  Court Reporter:          GEORGE J. STAIDUHAR
                             801 W. SUPERIOR AVE.,
22                           SUITE 7-184
                             CLEVELAND, OHIO 44113
23                           (216) 357-7128

24           - - - - -

25

1    APPEARANCES:

2        On behalf of the Government:

3

4            OFFICE OF THE U.S. ATTORNEY
             BY:   CHELSEA S. RICE, AUSA
             801 W. Superior Avenue, Suite 400
5            Cleveland, OH 44113

6                      and

7            UNITED STATES DEPARTMENT OF JUSTICE
             JASON M. MANNING - Criminal Division
8            Suite 600
             1400 New York Avenue, NW
9            Washington, DC 2005

10

11       On behalf of the Defendant:

12           JUSTIN J. ROBERTS, ESQ.
             Suite 1300
13           600 Superior Avenue
             Cleveland, OH 44114

14

15           PORTER, WRIGHT, MORRIS & ARTHUR
             BY:   EDMUND W. SEARBY, ESQ.
16           Suite 500

17           950 Main Avenue

18           Cleveland, OH 44113

19                  - - - - -

20

21

22

23

24

25

1

2               P R O C E E D I N G S

3               THE COURT:  We are here today on 20CR-424

4       United States versus Margaret Cole.  The case is here

5       today for sentencing.

6               In this case, the Court finds the Defendant

7       guilty of Count 11, in which she is charged with

8       conspiring to defraud the United States in violation of

9       18 United States Code, Section 371.

10               The Court additionally finds her guilty of

11       Count 13, in which she is charged with having made a

12       false statement to the Polish Central Authority in

13       violation of 42 U.S.C., Section 944.

14               Ms. Cole, have you received a copy of the

15       presentence report?

16               THE DEFENDANT:  Yes, your Honor.

17               THE COURT:  And have you gone through each

18       paragraph of that report with your attorneys?

19               THE DEFENDANT:  Yes.

20               THE COURT:  After going through the report

21       with your attorneys, do you believe there is any mistakes

22       in the report, or do you raise any objection to any of

23       the report paragraphs?

24               THE DEFENDANT:  No.

25               THE COURT:  And I would note counsel raised

1    certain objections to certain paragraphs, but are there

2    any additional objections to the report?

3                THE DEFENDANT:  I don't know what your

4    additional --

5                MR. SEARBY:  Your Honor, if I might assist,

6    Ms. Cole would incorporate by reference the objections

7    that are made and the points made in her sentencing

8    memorandum, which was filed under seal with the Court and

9    also with the addendum to the PSR, in the addendum to the

10   PSR.  If the Court would allow it, counsel would make

11   several points to supplement what's stated there.

12               THE COURT:  Have you provided Government

13   counsel with a copy of the supplemental argument?

14               MR. SEARBY:  No, your Honor.  I believe it

15   is subsumed in the arguments between the parties, and it

16   responds, in part, to certain statements made in the

17   Government's sentencing memorandum and to items filed by

18   the Government at approximately 4:00 p.m. yesterday

19   afternoon.

20               THE COURT:  Okay.  Well, let's -- the

21   objections that I'm aware of, we will go through them

22   sequentially, and you can make argument, and the

23   Government can respond on those.

24               The first, as much as I can tell, is the

25   objection to the probation officer's recommendation that

1    there be an offense Guideline addition because it

2    involved overseas or sophisticated means, which are two

3    separate acts made by the Government.

4              Let me press the Government to -- on the

5    second portion of the Government's argument on that and

6    on the sophisticated means with regard to Ms. Cole's

7    conduct, is there any -- what's the best argument you

8    have regarding sophisticated means?

9              MR. MANNING:  Yes, your Honor, I can address

10   that.  I will just note primarily that our primary

11   argument --

12             THE COURT:  I understood that.

13             MR. KRAMER:  -- on sophisticated means, the

14   best argument is that the conspiracy was not a garden

15   variety criminal scheme, that among sophisticated means

16   employed by the conspirators were a plan to have Cole and

17   clients change their flights to make sure that they did

18   not cross state lines with the child.

19             So they would fly directly from Europe into

20   Texas and then handing off the child with the assistance

21   of legal documents notarized to effect the transfer of

22   custody.

23             And before they even got to that situation,

24   the scheme required the conspirators led by the Defendant

25   Margaret Cole to press her Poland clients to conceal to

1    Polish authorities that they had this plan in place to

2    carry out an adoption under foreign law, to obtain visas

3    through the U.S. Embassy.  So this was a complicated

4    scheme that could only be carried out by an adoption

5    agency and the person that led it.

6            THE COURT:  Help me with understanding:

7    What's the difference between flying directly to Texas

8    and/or flying to Utah and putting the child on a plane

9    from Utah to Texas, how does that become sophisticated?

10           Is there some immigration or other check

11   that would have been present in Utah that would not

12   otherwise be present in Texas?

13           MR. MANNING:  Had the child crossed state

14   lines within the United States, it would have created

15   additional responsibilities to try to complete the

16   proceedings under Texas state law is our understanding,

17   and your Honor --

18           THE COURT:  If the child had landed in Utah

19   and immediately switched to separate plane to Texas,

20   would there have been any state adoption or state custody

21   proceedings in Utah?

22           MR. MANNING:  Yes.  I believe that would

23   have been treated as a different situation because the

24   child would have been relocated, rehomed to Texas.

25   Broadly speaking, your Honor, we understand this is not

1    the type of sophisticated means that involves multiple

2    levels of shell companies or forgeries.  It is not

3    sophisticated means of that nature.  Nevertheless, for

4    the reasons we stated we think it applies and the

5    substantial conduct overseas, which is the other prong of

6    that adjustment beyond that --

7    THE COURT:  Mr. Searby, do you have any

8    argument on the sophisticated means position the

9    Government takes?

10    MR. SEARBY:  Briefly, your Honor.  Would it

11    be allowable to the Court that I remove my mask?

12    THE COURT:  Yes, as long as you keep some

13    distance from everybody.

14    MR. SEARBY:  Certainly.  The counts of

15    conviction of the Government's indictment is a failure to

16    disclose, a failure to disclose and transfer the child to

17    various Government authorities.

18    Remaining silent is not sophisticated, and

19    we also recited a case involving the rejection by the

20    Court of Appeals of an enhancement for sophisticated

21    means in connection with a tax return, and the rejection

22    by the Court that filing a false tax return amounts to

23    sophisticated means.

24    In the 302 report of interview of the Poland

25    client, to my recollection, it is clear that the decision

1    to change flights was a decision made by Poland clients.

2    There may have been an indication from Ms. Parris they

3    should do it, but the Court puts its finger on the

4    illogic of this theory that the child would have crossed

5    state lines, whether they flew to Utah directly or Texas

6    and then Utah.

7              In addition, I would note for the Court, as

8    to Debra Parris, the sentencing Guideline calculations in

9    Ms. Parris' agreement do not include an enhancement for

10   sophisticated means, so it asks the question are we doing

11   it here?

12             In fact, Ms. Parris was certainly more

13   involved with the transfer of the child to her own

14   relative.  She was present in Texas.  My client was not.

15   My client's involvement really ended after she was asked

16   to help by the Poland clients develop options, and she

17   was not involved in the specific travel logistics.

18             THE COURT:  Okay.  I am going to find that

19   the sophisticated means provision doesn't apply in this

20   case.  You raise objection with regard to the other

21   portion of 2B1.1 with regard to whether or not the -- a

22   substantial part of the fraudulent scheme was committed

23   from outside the United States.

24             What's kind of the best argument on that?

25             She is here, but is that particularly

1    important, the fact that she is here?

2              Wasn't the whole scheme set up to bring a

3    foreign-born child to the United States.  Wasn't her role

4    of business centered around the idea of international

5    adoptions?

6              MR. SEARBY:  Yes, your Honor.  This case did

7    involve an international adoption as the Court knows from

8    Poland.  However, on this point, when you look at the

9    Government's sentencing memorandum, Ms. Cole and the

10   Government agree that the purpose of the enhancement is

11   where Defendants locate conduct overseas in order to

12   avoid detection.

13             THE COURT:  I am not sure -- do you have the

14   Guidelines right in front of you?  Take a hook at

15   2B1.1(b)(10).  So read along with me.  "If" -- and then

16   subparagraph (a), are you with me?

17             MR. SEARBY:  Sorry, your Honor.  I brought

18   the big one.

19             MR. MANNING:  I believe that's page 84.

20             MR. SEARBY:  I am with you, your Honor.

21             THE COURT:  In subparagraph (a), "the

22   Defendant relocated or participated in relocating a

23   fraudulent scheme to another jurisdiction to evade law

24   enforcement or regulatory officials," then colon, "a

25   substantial part of the fraudulent scheme was committed

1    from outside the United States," colon again or -- so
2    doesn't that suggest that (b) is alternative to (a) and
3    that it is not a requirement that there be -- that there
4    be a joining of the relocation possibility with the
5    substantial part of the scheme being outside the
6    United States? They are alternatives, right, (a), (b),
7    and (C), but you don't need (a) to have an application of
8    (b).
9            MR. SEARBY: Well, your Honor, I would agree
10   with the Court that part (b) indicates that locating an
11   operation overseas --
12           THE COURT: But it doesn't say that, it
13   doesn't say "locating." It says a "fraudulent part of
14   the scheme was committed outside the United States."
15           MR. SEARBY: I am reading the example it
16   gives.
17           For example, "in a telemarketing scheme
18   located in the main office of the scheme in one
19   jurisdiction but locating soliciting operations in
20   another jurisdiction ordinarily indicates
21   sophistication."
22           THE COURT: Yeah, but -- and let me ask the
23   Government to chime in as well -- I think perhaps you
24   misread the Guideline. Under (b)(10), are there not
25   three alternative independent ways (b)(10) can be

1    violated or be applicable, one where there is an

2    intentional relocation, a second one where there is a

3    substantial part of the fraudulent scheme committed

4    outside the United States, or three, the offense

5    otherwise involves sophisticated means.

6             Do you have a position?  Am I missing that

7    or --

8             MR. MANNING:  Your Honor, the Government's

9    position is as the Court is reading that correctly.

10   Exactly as the Court has stated, these are three

11   independent grounds for the enhancement to apply, and the

12   independent ground upon which the Government is relying

13   is the prong in (b), which requires that a substantial

14   part of the scheme be committed from outside the

15   United States.

16            And the appellate case law that the

17   Government cites the Williams case, the Orno case, all

18   hold that when the Court is evaluating the conduct, it is

19   not merely a conduct of the Defendant but the conduct of

20   the entire conspiracy.

21            For the reasons we set forth in our

22   submission, as the Court has already put its finger on,

23   not only was a substantial part of the conduct here

24   overseas, the conduct overseas was integral.  You

25   couldn't have the scheme without EAC's clients being in

1    Poland seeking to adopt Polish children, under Polish

2    law, through Polish courts, obtaining visas from the U.S.

3    Embassy in Poland and then for the Defendant Margaret

4    Cole to tell false statements to the Polish Central

5    Authority when they were --

6                    THE COURT:  Isn't that what the Williams

7    case says?

8                    MR. SEARBY:  Um, your Honor, it does but a

9    couple points:

10                   First of all, I agree with the Court that

11   these are stated in the alternative, but I believe if the

12   Court goes back to the original 1998 Sentencing

13   Commission Guidelines policy statements and official

14   commentary that we cite, that was the original purpose

15   underlying where a substantial amount of the conduct is

16   overseas, but let's talk about really the point whether a

17   substantial amount of the conduct, it is not whether

18   there is conduct overseas; it is whether there is a

19   substantial amount was overseas.

20                   Really, the gravamen of the offense here is

21   what transpires after they leave Poland.  In fact, if you

22   read the FBI 302 report of interview of Poland clients,

23   they make it clear they did not have their minds made up

24   until they were flying home.

25                   So the offenses for which Ms. Cole has pled

1    guilty involve reporting violations.  None of the charged

2    Defendants here ever left the United States in connection

3    with this offense.  And the only overt act in the

4    indictment that was committed overseas is a reference to

5    an unindicted co-conspirator assisting the Poland clients

6    with obtaining the visa, which they did in Poland.

7    That's the only act.

8                    When you again get into the FBI 302 and take

9    out the lawyer's spin and see what Poland clients said

10   actually happened, it is not clear that there was any

11   specific assistance as to obtaining the visa and clear

12   that the Poland clients who were never charged as being

13   participants in this scheme were wholly responsible for

14   obtaining the visa in Poland, which involved them listing

15   the address to which they intended to travel with the

16   child when they left.

17                    THE COURT:  Okay.  I will overrule the

18   objection.  I think that under 2B1.1(b)(10), there is

19   three alternative ways that the Guideline could play into

20   this, and the second of those is when there is a

21   substantial part of the fraudulent scheme that was

22   committed from outside the United States, and in this

23   case, the whole background of the scheme was to

24   perpetrate a fraud on the Polish authorities and

25   perpetrate a fraud on the United States authorities with

1    regard to the Polish adoption.

2            So I find that (b)(10) applies, and I will

3    overrule your objection as to that.

4            Your second objection, I believe, is --

5    deals with vulnerable victim, two-level increase.  What's

6    the best argument on that?  I mean, this child -- do you

7    deny that the child herself was a victim?

8            MR. SEARBY:  She certainly was a victim,

9    your Honor, and it is a terrible --

10            THE COURT:  Do you believe she was

11    vulnerable?

12            MR. SEARBY:  Within the definition of the

13    Guidelines, she was vulnerable, and that the Guidelines

14    indicate that age, a child is a vulnerable victim.  We

15    are not arguing that.

16            What we are arguing is that the crime by

17    which she was victimized is not the crime for which my

18    client is here today.  And I think that the important

19    point that the Government obscures in its memorandum goes

20    to a legal point, and that's the lack of proximate

21    causation.  The Guideline applies where the offense of

22    conviction causes harm to a vulnerable victim.

23            THE COURT:  Well, in this case, did -- do

24    the regulations require an earlier home, basically a

25    certification of the adopting parent?

1          MR. SEARBY:  Your Honor, the regulations to

2     adopt a child, if that's the question, would require a

3     home study and for the child to be vetted.

4          THE COURT:  Was there any home study done of

5     the Parris location?

6          MR. SEARBY:  Yes, your Honor, and this is

7     exactly where I was headed.  There is a significant

8     intervening event, and that is before the crime is

9     committed against the child in the United States.  The

10    Parris relatives are vetted by the state.

11         THE COURT:  And that's part of the fraud

12    scheme.  They get the adoption in February of '16,

13    right?

14         MR. SEARBY:  Well, your Honor, I don't agree

15    that it is a fraud.  I think to the issue of this

16    enhancement --

17         THE COURT:  Didn't your client basically

18    represent Poland and to the United States that -- she

19    failed to indicate to them that the adoption had taken

20    place before they communicated with her.

21         MR. SEARBY:  I believe it was the opposite,

22    your Honor, that she reported the dissolution of the

23    foreign adoption, and she reported to the COA, the

24    Council on Accreditation, that the adoption was in

25    process when I believe the adoption was already final

1  under state law.

2          But the point I want to go to, which is not

3  in the Government's memorandum and there are statements

4  in the Government's memorandum that become misleading to

5  the Court when this fact is admitted is the fact that the

6  crime occurred after the Parris relatives had a home

7  study, were vetted by the state, and were approved to

8  adopt the child under state law, and it is after that

9  point in August of 2016 when the crime against the child

10  occurred.

11          So we can ask ourselves if the crime had not

12  occurred in August, but the Parris relative father three

13  years later was driving drunk, and the child was injured,

14  would my client still be responsible as, you know, for

15  harm to a vulnerable victim, and I think the answer is

16  no, and the answer is still no in August '16 because

17  there is a significant intervening event.

18          THE COURT:   Is the Texas juvenile court, if

19  Texas is going to approve the placement with the Parris

20  family, does that end any violation of failing to report

21  to the Polish authorities where the child was actually

22  going to go just simply because some state court makes

23  a decision that it is okay to place with the Parris

24  family?

25          MR. SEARBY:   I don't think it does, and the

1    issue of reporting violations, in fact, my client has

2    pled guilty to a reporting violation, which occurred

3    after the adoption was finalized.  But this particular

4    enhancement is focused on the crime of conviction causing

5    harm to the child, and the Government's theory of the

6    case was that because the child was transferred without

7    being vetted the harm occurred.

8            The other fact I would want the Court to

9    know is that in July of 2015 when the child was

10   transferred to the Parris relatives at the airport in

11   Texas, at that point, EAC as far as my client knew had

12   ordered a home study on the Parris relatives.  As rightly

13   pointed out in the PSR, that home study was delayed at

14   the advice of counsel, but that's true, the full

15   situation that occurred.

16           THE COURT:  On this vulnerable victim, does

17   the Government have an argument on that?

18           MR. MANNING:  Can you repeat the question,

19   your Honor?

20           THE COURT:  On the vulnerable victim, it

21   sounds like counsel for Ms. Cole is arguing that she

22   couldn't have been a vulnerable victim.  The state of

23   Texas otherwise approved the placement with the Parris

24   family.

25           MR. MANNING:  Yes, your Honor.  It is the

1  Government's position that the actions of the state of

2  Texas in February 2016 are essentially irrelevant to

3  Ms. Cole's culpability to the charged crimes and

4  irrelevant to the application of this enhancement.

5          We believe the enhancement applies because

6  in the Government's view the gravamen of this conduct is

7  the conspiracy led by Margaret Cole and her

8  co-conspirators in July of 2015 to direct their client to

9  transfer a vulnerable Polish orphan into a home that was

10  completely unvetted and, therefore, was dangerous, which

11  Cole knew, and the child would never have been placed in

12  the home if not for the direction of Cole as your Honor

13  put its finger on.

14          There was no home study done at the time.

15  Poland clients had even sent an e-mail to Margaret Cole

16  while they were still in Poland saying, has this family

17  done their home study, to which Margaret Cole never

18  responded.

19          She caused the child to be placed into that

20  home.  If there had been a home study, it would have

21  uncovered that one of the parents had a domestic violence

22  record.  If the Polish authorities knew that information,

23  the Polish authorities, it is our understanding, would

24  not have allowed that child to go into that home.

25          And the Polish authorities also would not

1    have allowed the child to be split from the child's

2    sibling, and the Polish authorities describe that in

3    detail in their victim statement to the Court.

4             And so but for Margaret Cole's conduct, the

5    child never goes in the home.  The fact that Texas in

6    February of 2016 thought this was okay does not change

7    the fact that Cole is a responsible place in a dangerous

8    home and worked out tragically as we know.

9             For those reasons, we believe the

10   enhancement applies.

11            Thank you.

12            MR. SEARBY:  Your Honor, may I quickly

13   respond to one point?

14            THE COURT:  In the FBI report doesn't the

15   Utah couple, aren't they quite clear that they assumed or

16   been led to believe that the Texas couple, the

17   Parris couple had already received approval for the

18   adoption?

19            MR. SEARBY:  Your Honor, my recollection is

20   they weren't clear on that point, whether they had an

21   understanding of home study, but I am going by memory,

22   your Honor.  I do want to respond to my colleague's point

23   though;

24            That Ms. Cole caused the child to be placed

25   with the Texas family, and I think it is important to

1   remember, first of all, they were given a list of
2   options.

3              Second of all --

4              THE COURT:   The list of options, your client
5   had a number of other adopting families that were in
6   Poland at the same time, right?

7              MR. SEARBY:   I believe there were other
8   families.

9              THE COURT:   And almost from the get-go
10  hadn't they expressed a desire for a child that was one
11  to two years of age?  And hadn't they also, when they got
12  to Poland and had the emotional trouble with the older
13  daughter, hadn't they asked several times whether it
14  might be possible to just adopt one?

15             MR. SEARBY:   Your Honor, they talked about
16  all options.  I think one point that is important and it
17  is clear, the Court read the FBI 302 and on behalf of
18  Ms. Cole, I am appreciative of that fact because I think
19  it puts the offense in conduct, but the Poland clients
20  were very clear that they were not going to leave the
21  child in Poland, and as of --

22             THE COURT:   That's because your Poland agent
23  told them the child would never be adopted, that the
24  child would get a red mark against the Parris, and that
25  they would spend the rest of their life in an orphanage.

1          MR. SEARBY:  I think they were influenced by

2    those comments, but if you read the FBI report of

3    interview, they describe concerns for the condition of

4    the children in foster care in Poland.

5          In any event, this came to Ms. Cole late,

6    and at the point they came to Ms. Cole, there were

7    approximately 48 hours between when Ms. Cole responded

8    and first spoke to the mother of Poland client.

9          And when they became the parents under

10   Polish and U.S. law, and they did not cause -- my client

11   did not cause the child to be placed there.  They were

12   given options, and in the FBI report of interview, they

13   make it clear that they believe that Ms. Cole was acting

14   in good faith; that she was trying to help, and she did

15   not unduly influence them, that it was Ms. Parris they

16   believe two years after the fact who was responsible for

17   that.

18          THE COURT:  Okay.  Well, I am going to

19   overrule the objection.  I do think the child was a

20   vulnerable victim.

21          I do think -- first of all, a victim of the

22   offense under the Sixth Circuit Webster decision.  And I

23   do think it is fairly obvious the child was vulnerable as

24   well.  So I will overrule the objection as to those two

25   levels.

1            I think the next objection is to 3B1.3, and

2    the application of the abuse of position of trust.  In

3    this case, what's the Government's best argument on

4    that?

5            She to some degree was licensed or certified

6    to run an adoption agency.  Is that enough to put

7    somebody in a position of trust?

8            MR. MANNING:  Your Honor, that's one of the

9    factors that we point to.  The Government's -- the

10    Government would believe the two best arguments for why

11    the abuse of trust enhancement applies, first off,

12    central to the scheme is the fact that EAC was licensed

13    and accredited to carry out adoptions in Poland.

14            And the letter from the Polish Central

15    Authority to this Court makes clear that when the Polish

16    Central Authority licenses a U.S. agency to coordinate

17    adoptions of their own vulnerable orphans, that they

18    trust that the U.S. agency will follow the applicable

19    rules and will disclose to the Polish Central Authority

20    that they are following the rules.

21            They put their trust in EAC and in Cole to

22    do that, and the EAC led by Margaret Cole abused that

23    trust by concealing from Polish authorities this plan to

24    split two siblings, and the Polish Central Authority,

25    their witness Mr. Pedgorski, at the trial would have made

1  clear --

2          THE COURT:  That's true to some degree in
3  all fraud cases.

4          Is the cornerstone of the position of trust
5  whether the position is one that inherently has
6  discretion?

7          MR. MANNING:  Yes.  The comments to 3B1.3
8  emphasize the importance of an employee who has
9  discretion and, therefore, is not subject to oversight.

10          THE COURT:  In this case, Poland may have
11  relied upon the agency to do an honest report, but I am
12  not sure how an abuse of a position of trust, it seems
13  abuse that the discretion is not inherent in the giving
14  of a false statement.

15          MR. MANNING:  Well, your Honor, we have two
16  arguments in response to that.  One, Margaret Cole was
17  the executive director of the agency, and so the way we
18  read that language about people who have positions that
19  are subject to discretion, not subject to oversight,
20  there was no one at EAC who could stop her once she put
21  together this plan.

22          And the Sixth Circuit's language in Freeman
23  is instructive where the Sixth Circuit in Freeman says
24  the essence of an abuse of trust is when you have a
25  victim who is the sort of having less knowledge and has

1   to turn to someone who by virtue of their position the

2   victim trusts and places their trust into that person to

3   sort of guide them to do the right thing.

4              Here the Poland clients had the situation

5   where they were in Poland, and they realized they might

6   not be able to raise these two kids, and they turn to

7   Margaret Cole as the executive director of the agency and

8   trust her to lead them to a solution that with all of her

9   experience and expertise would be safe and ethical and

10  legal.

11             THE COURT:   I am not sure you are not

12  conflating the fact that there may have been, you know, a

13  fraudulent -- a reliance upon fraudulent conduct and

14  conflating that with the whole issue of:   Were they given

15  particular discretion?

16             In this case, the two parents apparently had

17  kept some discretion themselves as to whether they were

18  going to turn the child over in the final transition.   So

19  how could they have been relying upon -- and they had

20  been given these three options.   Two of them seemed to be

21  fairly obviously not workable.

22             How was Cole given the discretion to make

23  the final decision?

24             MR. MANNING:   Cole has the discretion to

25  guide her clients how to resolve the situation and that

1    the clients trusted her.  If they are going to give

2    options, the clients trust those options are legal and

3    safe, and it is Cole who has decades of experience in

4    this field that she has touted and bringing her clients

5    into her business.  The clients are in Poland.  They have

6    never done an adoption before, and so they turn to her

7    and place their trust in her, and when she is given

8    options, she has the reasonable expectation that the

9    options will be legal, that the options will be

10   appropriate, and Cole abused that, and Cole made a choice

11   to give an option that included, you know, this illegal

12   scheme.

13              THE COURT:  Do you have any response on

14   that?

15              MR. SEARBY:  Your Honor, to the extent the

16   Government is now trying to argue that Ms. Cole abused a

17   position of trust with the clients, the clients don't

18   believe that.

19              Again, if you go to the FBI 302 and see what

20   they are saying two years after the fact, they are saying

21   take Ms. Cole was a good person and, quote unquote,

22   trying to help.  So they don't believe she abused a

23   position.

24              THE COURT:  I am not sure that's the center

25   of the decision on the position of trust, you know,

1  whether the duped party appreciates that they were duped.

2  Isn't it more a question as to whether Cole by regulation

3  or statute was otherwise put in a position where the

4  certifying agency had relied upon her discretion.

5              MR. SEARBY:  Well, as the Government said,

6  the question goes to really whether they are subject to

7  oversight.

8              The classic abuse of the position of trust

9  is the lawyer is put in as a fiduciary person and as a

10  competent person and steals their money.

11              EAC was subject to the whole system of

12  international adoptions to significant oversight.  Under

13  that system, the Council on Accreditation was appointed

14  to act for the State Department and to conduct audits of

15  the EAC, to conduct physical inspections of their

16  offenses, and then EAC every four years had to go through

17  a reaccreditation process.

18              I think to the Court's question, to my

19  friend from the Government, if you extend the enhancement

20  this far, then in virtually every case when somebody does

21  business with the Government or interfaces with the

22  Government, a perceived false statement or false

23  statement of conviction would result in the application

24  of this enhancement, and I think it stretches the

25  enhancement way beyond its purpose.

1       MR. MANNING:  May the Government respond to

2   one point?

3       THE COURT:  Go ahead.

4       MR. MANNING:  With respect to the oversight

5   provided by Pilla, the evidence at trial would have shown

6   that a centerpiece of that oversight is that the

7   executive director as Margaret Cole had to provide a

8   compliance with all the governing regulations, and the

9   evidence would have shown that within that certification,

10  she had done so after she organized the scheme.

11      And therefore, she was placed in trust to

12  certify to her compliance honestly, and she didn't.  She

13  sent in a false certification in a sense.

14      To the Court's point, COA does not have the

15  resources by every accredited agency in the United States

16  and COA depends on the certifying honestly, and in this

17  case, Ms. Cole abused that trust.

18      Thank you.

19      THE COURT:  I think to some degree you are

20  correct there, but they rely on them, but I nonetheless

21  am going to sustain the objection.  I think the

22  cornerstone of 3B1.3 is really whether a Defendant has

23  been put in a position where significant discretion was

24  given by either regulation or by practice to the

25  Defendant.

1          And in this case, you correctly make an

2    argument that the Polish authorities and to some degree

3    the American authorities relied upon her statement.

4          But I don't think that's the same

5    determination as a determination as to whether the

6    position itself gave her any particular discretion that

7    would justify the 3B1.3 addition.  So I will sustain the

8    objection as to that.

9          The Government had raised -- do you have any

10   other objections?

11         MR. SEARBY:  Your Honor, on behalf of

12   Ms. Cole, we had a further objection to the organizer,

13   leader, manager --

14         THE COURT:  That's correct.  So in this,

15   what's the best argument you have with regard to that?

16         MR. SEARBY:  Your Honor, again, I think if

17   you walk through the 302 and you listen to the Poland

18   clients about what actually happened, Ms. Cole didn't

19   organize the conduct here?

20         In addition, the case law around this

21   enhancement focuses on Ms. Cole managing other

22   individuals, and her involvement was limited.  Again,

23   shortly before the adoption being finalized in Poland,

24   Poland clients on their own initiative reached out and

25   asked her for help, and again, they believe Ms. Cole was

1    trying to help.  Ms. Cole was, in fact, a limited

2    participant in what occurred.

3              The Government has relied on the fact that

4    she was the director of EAC to suggest that this

5    enhancement is appropriate.  I think the Sixth Circuit's

6    decision in Camper cited in other sentencing memo is

7    instructive in this regards, and what matters is not that

8    someone is an organizer or a leader in an organization or

9    even in the criminal conduct; what matters is you manage

10   the conduct.

11             I think we can come back to the Court's

12   word, the discretion here, and a lot of what transpired

13   here was at the discretion of the Poland clients.  They

14   were the ones who said they were not going to leave the

15   child in Poland.  They were the ones who chose the Parris

16   relatives as the family over the option of other families

17   and also respite care, which was really my client's

18   recommendation.

19             And I would note, as we do in other

20   sentencing memos, Ms. Cole placed substantial discretion

21   and had limited oversight of what Ms. Parris did.  In

22   fact, Ms. Cole gave her power of attorney to do anything

23   in furtherance of the business of the EAC.  So for those

24   reasons and those stated in the sentencing memo, we

25   believe the organizer, manager, enhancement is

1    inappropriate under the facts of this case.

2           THE COURT:   In her discussions with Parris,

3    didn't she tell Parris to get the family to agree that

4    they had only taken the child for temporary holding?

5           MR. SEARBY:   Your Honor, there is the e-mail

6    that the Court has probably seen where Ms. Parris sends

7    an e-mail -- I believe it was Ms. Parris sends an e-mail

8    to that effect to Ms. Cole.

9           I have no information that e-mail was ever

10   used.  But I think it is important that in the trial of

11   the crime against the child committed by the Parris

12   relative, Ms. Parris repeatedly testified under oath

13   that, in fact, the transfer was for respite care.

14          So that would have been a true statement at

15   the time.  In fact, the only legal status -- they

16   couldn't say the child was transferred to the adoptive

17   parents because they had no legal status.  The only legal

18   status they had at the time of the transfer in 2015 was

19   for temporary care pending either an approval of an

20   adoption, and that may have been their hope and dream,

21   but that was not, in fact, the status in July of 2015

22   when the child was transferred from Poland clients to the

23   Parris relatives.

24          THE COURT:   But it was never intended to be

25   respite with the idea that the child would go back to the

1  Utah couple, was it?

2              MR. SEARBY:  Your Honor, if you look at the

3  report written by the social worker, Nancy Wolf attached

4  to our sentencing memo who spoke to Poland client right

5  before they left Poland, the discussion was about

6  temporary respite care.

7              There are also e-mails between my client and

8  Poland client where they discuss the benefits of respite

9  care.  In fact, Poland client says that she is even

10 having cold feet about transferring the child

11 temporarily.  So no, I would not say that was never the

12 discussion.

13             That was, in fact, my client's hope that

14 what would happen was they could return to their home

15 after six weeks in Poland.  They could get a break for

16 this child who they reported was extremely difficult, and

17 then, they could make a clear decision about whether

18 they co-parent the child or whether there would be

19 another solution.

20             THE COURT:  Well, Parris though, Parris at

21 your client's direction solicited the e-mail from the

22 recipient couple, right, falsely saying that it was only

23 a temporary guardianship.

24             MR. SEARBY:  Your Honor, my client is

25 unclear on it.  Ms. Parris may say she did it at

1  Ms. Cole's suggestion, but I think you have to ask

2  yourself --

3          THE COURT:  She gave that to your client,

4  and your client then forwarded it on, correct?

5          MR. SEARBY:  That's correct, and Ms. Parris

6  testified over and over in a Texas Court that, in fact,

7  the transfer was for respite care.

8          THE COURT:  But your client knew that the

9  Parris couple was, you know, they were brought into the

10  play only because of your client, right?  Your client

11  said there are three options, a single New York woman, a

12  Utah couple with five or so kids, and the Parris couple

13  which seemed attractive because they had one daughter

14  relatively close in age to the 5 year-old.

15          MR. SEARBY:  There was three options, and

16  there was a fourth.

17          THE COURT:  Who gave the fourth?

18          MR. SEARBY:  As I understand it, it was a

19  foster care situation in Utah.

20          THE COURT:  Do you have some response on the

21  manager?

22          MR. MANNING:  Yeah.  Thank you, your Honor.

23          Briefly, first, the Government is puzzled by

24  the advocacy by the defense here because Ms. Cole pleaded

25  guilty under oath in this Court to Count 11 and Count 13,

1    both of which at their core had false statements about

2    saying that this was for respite care when Cole knew that

3    it was not at the time the child came out of Poland, we

4    are surprised this issue is being revisited here.

5              As for the application of the organizer,

6    leader enhancement, this Court is exactly right, this

7    two-point enhancement that we are seeking under the Sixth

8    Circuit law, recruiting someone into the conspiracy or

9    supervising someone under the conspiracy is sufficient

10   for the enhancement to apply.

11             Here Margaret Cole brought Parris into the

12   conspiracy.  Parris otherwise had no contact with the

13   Poland client.  She brought her into the conspiracy,

14   recommended that her relatives take this child,

15   coordinated with Parris to direct these false statements.

16             The e-mail your Honor is referring to is

17   dated December 9th, 2016, and in Debra Parris' guilty

18   plea, she indicated she sent that to Ms. Cole at Cole's

19   direction to falsely stay the detention with respite

20   care.

21             Two days later Margaret Cole uses that to

22   send the false statement to Polish authorities repeating

23   this falsehood, relying on what she has obtained from

24   Debra Parris.  Parris is a salaried EAC employee, and so

25   we also argue that Margaret Cole organized and led

1  co-conspirator 1's participation in this as well who

2  depended on EAC for hundreds of thousands in revenue.

3  And for all these reasons for the manager,

4  the Carter and Rexton precedent in the Sixth Circuit, the

5  organizer enhancement applies here, your Honor.

6  MR. SEARBY:  One sentence, your Honor.

7  My client did not manage or supervise the

8  day-to-day activities of the other individuals who were

9  charged.

10  THE COURT:  Okay.  I am going to overrule

11  the objection to the two-level increase for the

12  organizer, leader.  There was other participants.

13  I find that the Defendant really had the

14  decision-making authority, and she was involved with the

15  recruitment of Parris, and there is no indication that

16  she got a larger share of the money, but she did exercise

17  a degree of control that was over Parris and over the

18  others that I think justifies the 3B1.1 increase.

19  I think those are all the objections that I

20  had seen.  The Government raises one objection as best I

21  understand arguing that medical conditions are not

22  specifically a grounds for a sentencing decision.

23  Do you have anything you want to say on

24  that?

25  MS. RICE:  Thank you, your Honor.  I can

1  speak to that.

2          In the initial presentence report, there

3  were limited medical records included, and that was

4  simply commenting the Government had not seen more

5  specific records.  During the Government's discussion of

6  the 3553(a) factors, we will speak further as to the

7  specific medical conditions identified in the final PSR.

8          To the extent this is an objection, it is an

9  objection to any variance or departure based on medical

10 condition.

11         THE COURT:  Okay.  Medical conditions I find

12 under more recent authority to be something that can be

13 considered.  So if that was an objection to that, I will

14 overrule it.

15         So in this case, I would set the base

16 offense level at 6.  I would find there should be a

17 six-level increase under Guideline 2B1.1(b)(10), which

18 would take it to 12.

19         I find a further two-level increase because

20 I find a vulnerable victim was involved.  I give a

21 further two-level increase because I find the Defendant

22 under 3B1.1 that the Defendant was a leader, manager, or

23 supervisor of the criminal activity.

24         I would decline to give the 3B1.3 increase

25 that is suggested because I find the position of trust is

1    not applicable.  That adjustment is not applicable in

2    this case.

3              So I set the adjusted offense level at 16.

4    The Defendant gets two levels off for acceptance of

5    responsibility.  The total offense level comes in at 14.

6    The Defendant has no Criminal History points.  She

7    receives a Criminal History Category I.

8              So having made those findings, does the

9    United States have any argument before sentence is

10   imposed?

11             MS. RICE:  Thank you, your Honor.  May I

12   approach the podium and speak from the podium?

13             THE COURT:  Yes.  Let me ask you to hold for

14   just a second.  Okay.

15             Do you have any argument?

16             MS. RICE:  Thank you, your Honor.  Before I

17   begin, there are victims that would like to speak.  Would

18   you like to hear from them now or after the Government

19   makes argument?

20             THE COURT:  Why don't you ask them to speak

21   before?

22             MS. RICE:  Thank you, your Honor.

23             MR. DAVIS:  My name is Adam Davis.  This is

24   my wife Jessica, my son Isaac.  We would thank you, your

25   Honor, for this brief moment today to share with the

1  Court a little of our experience with Margaret Cole and

2  European Adoption Consultants.

3          In 2015, our family adopted a child from

4  Uganda through European Adoption Consultants.  Upon our

5  return to the United States from Uganda, we reported to

6  EAC many unseemly happenings in Uganda, via European

7  Adoption Consultants, managers, and in-country team.

8          We requested on multiple occasions to speak

9  with Margaret Cole regarding the bribery, the harassment,

10  the exploitation, the threats, and the coercion that we

11  had witnessed there believing Margaret Cole would be

12  horrified by these happenings within her organization.

13  None of our phone calls were ever returned by her.

14          When we learned a year later that the child

15  we adopted was not uneducated, had not been abandoned by

16  a neglectful or indifferent mother and had three times as

17  many siblings as what we were told not to mention a huge

18  extended family that loved our adopted daughter very

19  much, we made the difficult but humane decision, the

20  moral decision to reunite this child with the family and

21  the mother who never intended to surrender her parental

22  rights to her child to begin with.

23          After our child was returned home to her

24  mother and family, only then did Margaret Cole try and

25  contact us, not to follow-up on the many ethical concerns

1    we had expressed about her adoption outfit, not to

2    inquire about our welfare or the welfare of our adopted

3    child, Margaret Cole contacted us then to breathe threats

4    and to protect the empire she had built praying upon the

5    poor and exploited the world's most vulnerable children

6    for financial gain.  Margaret Cole is EAC, and EAC is

7    Margaret Cole.

8              She is responsible for this criminal

9    enterprise from top to bottom.  The lowest level child

10   finder in our daughter's rural village in Uganda spoke

11   directly to Margaret Cole on the phone when our daughter

12   returned home as our attorney can confirm.  She is that

13   intricately involved in her operation.

14             She cannot plead ignorance to anything when

15   it comes to EAC.  Margaret Cole not only swindled our

16   family out of our life savings, trafficking children for

17   adoption, but she was also prepared to slander me to my

18   employer and rob me of my livelihood as well as our

19   child's social worker at the time can attest.

20             Margaret Cole is guilty.  Those willing to

21   exploit the poor and commoditize the children of the poor

22   in pursuit of wealth belong in their own nefarious

23   category of inhumanity.  We ask that her sentence today

24   reflect this.

25             Again, thank you for the time.

1          THE COURT:   Thank you.

2          MS. RICE:   Thank you, your Honor.

3               I will reference the additional victim

4     impact statements, which I know your Honor has received

5     and read in a moment.  But I wanted to start with, as my

6     colleague referenced, a reminder that I didn't think we

7     would have to go back over the ground of why we are here

8     today.

9               But Margaret Cole has pled guilty to

10    knowingly and willfully making false statements, to

11    knowingly and voluntarily entering into a conspiracy to

12    defraud the United States.

13              In her sentencing filings and argument

14    today, there seems to be some backwards ground as to

15    whether she truly is admitting to the conduct here.

16              The Government is not asking the Court to

17    eliminate the two levels for acceptance of

18    responsibility, but we are a bit perplexed we have to

19    revisit ground we thought we already covered at our plea

20    hearing and plea agreement.

21              So with that background, your Honor, this is

22    a serious offense.  This is not a one-day or a two-day

23    offense.  This is not a lapse in judgment.  This is

24    conduct that spanned over a year that involved lies to

25    United States authorities, to foreign authorities, and

1    perhaps, most importantly, to couples who were putting

2    their full trust in her with respect to the livelihood of

3    children of orphans.

4              The Defendant has routinely referred to this

5    as being a few days and feeling badly that she offered to

6    help the Rumpuses.  This was not a technical or

7    administrative violation; this was not a reporting

8    violation.  This was making lies to COA, to the Polish

9    Central Authority, and to Rumpuses.

10              THE COURT:  What's your theory, if the

11   Rumpus adoption fell through, what's the theory on how

12   that impacts the Defendant?

13              MS. RICE:  Thank you, your Honor.  The

14   testimony at trial would have been from the Polish

15   Central Authority that EAC would have lost their

16   accreditation, and at the time of the Rumpus adoption

17   pending, Poland was 40 percent of the revenue for EAC.

18              THE COURT:  Well, let me go back.  They

19   go over there.  There is some indication they are told

20   it would be just a visit, and they would come back and

21   make a decision not to adopt anyone.  Is that the

22   background?

23              MS. RICE:  With respect to when the Rumpuses

24   first went to Poland?

25              THE COURT:  Yes, in 2015.

1    MS. RICE:  So they went to Poland believing
2  they were adopting two sisters.  And when they got there,
3  they immediately discovered --
4    THE COURT:  I thought the representative in
5  Poland had made some statement to them, to the impact
6  that if they got over there and decided they couldn't
7  handle two, that they could just leave without any.
8    MS. RICE:  You are referring to
9  co-conspirator 1, your Honor?
10   THE COURT:  Yes.
11   MS. RICE:  So what the final understanding
12 of the Rumpuses, they could not just take one or be red
13 marked.
14   THE COURT:  That's after they get over
15 there.
16   MS. RICE:  Correct.  You are talking about
17 in proceeding, going through the lengthy process of
18 getting to Poland to adopt?
19   THE COURT:  Right.
20   MS. RICE:  Yes.  They were given a number of
21 adoptions who they could adopt, but initially, they did
22 not want to adopt older children and were told there
23 would be other options, and as your Honor is well aware,
24 when they got to Poland with the two sisters, they -- it
25 was more than they felt their family could handle, which

1  brings us here today.

2          I don't know if I answered your question

3  accurately, your Honor.

4          THE COURT:  So they get over to Poland.

5  They spend six or seven weeks with the two young

6  girls?

7          MS. RICE:  Correct, your Honor.

8          THE COURT:  And then, they try to -- they

9  notice some fairly immediate difficulty with regard to

10  the older child, less difficulty with regard to the

11  younger child.

12          MS. RICE:  Correct.  They noticed difficulty

13  with both, but they found the older one had more severe

14  mental difficulties that would be difficult for them with

15  their three sons and the younger child to provide the

16  adequate care.

17          THE COURT:  Aren't they then in a quandary

18  because they obviously have grown to love these two girls

19  and their concern for the two individual girls and had

20  been told that the girls will just be condemned to a life

21  in an orphanages if they don't take them?

22          Aren't they in a quandary where they can't

23  handle two, but they don't want to leave either child

24  there?

25          MS. RICE:  That's correct, and I will note

1    that the 302 that the Court has from several years ago,

2    we are glad the Court has that, the Rumpuses' interviews,

3    but to note at that time, the Rumpuses were not shown nor

4    were they aware of any of the false statements that the

5    Defendant has admitted to, and there were are later

6    interviews and testimony given by them.

7            But one thing they were consistent on

8    throughout, they had been consistent on all of their

9    testimony, they were not leaving either child there

10   because they were told if they left one child in Poland,

11   that child would be red marked, likely left in an

12   orphanage and could potentially die.

13           THE COURT:  Would Poland allow the

14   immigration of a single one of these sisters?

15           MS. RICE:  No.  If the Polish authorities

16   had been notified as they should have been, they would

17   not have allowed the siblings to have been split up, and

18   Mr. Pedgorski would have testified to that at trial and

19   speaks to that in his impact statement.

20           THE COURT:  So they are in a position where

21   it is either all or nothing, right?

22           MS. RICE:  Correct, your Honor, and while

23   they realize they could not care for both children, they,

24   of course, wanted nothing but the best for them.  And

25   that's why based on the representations from the

1    Defendant the Tufts family was so appealing.  They

2    believed this was a family that could give the adequate

3    care and attention to the older child that she needed.

4    They cared for her very much as evidenced by the fact

5    that after she was horrifically abused, they spent years

6    of their life and expense to get her back to her family.

7            But yes, your Honor, they certainly at the

8    forefront of their mind was ensuring that both children

9    were cared for and placed in a home where they would be

10   safe, which speaking to the Defendant's role here, your

11   Honor, she communicated with them.

12           They trusted her.  They called her up, and

13   as the 302 and e-mails show, they were in a very

14   emotionally charged, very trying situation, and they

15   turned to her and her thousand adoptions, years of

16   expertise to do and guide them in what is legal.

17           She had multiple opportunities.  It was

18   referenced earlier that this all happened within 48

19   hours.  Forty eight hours was more than enough time to

20   notify the Polish authorities that a family in Poland

21   will not be taking both children to their home.  Forty

22   eight hours, if it is even 48 hours -- the Government

23   submits it was much longer than that -- that is

24   sufficient time to notify COA.

25           That is sufficient time to tell the truth.

1    The Defendant chose not to and instead facilitated and

2    led this conspiracy to have the child transferred to a

3    family that had no vetting, had no background check, and

4    the Defendant in her years of experience, decades of

5    doing intercountry adoption is well aware of the

6    requirements for background checks and vetting, and

7    indeed, when the Rumpuses asked has this family had a

8    home study, there was no response.

9              There also has been reference to and various

10   filings, this being a black swan event and this never

11   happening before.  Well, one of the counts to which the

12   Defendant has pled guilty and admitted conducting

13   committing is knowingly and willfully making a false

14   statement.  And the Defendant is well aware the need to

15   tell the truth.

16             This is certainly not the first time.  There

17   have been reports required to COA or to foreign

18   countries.  So this is not a black swan event when it

19   comes to telling the truth and being honest.

20             And here what is really telling, your Honor,

21   and speaks to the Defendant's intent at the time of the

22   original transfer of the children to the Tufts family is

23   that months and months go by where she knows they have

24   not been vetted, where the Polish authorities have not

25   been notified, where COA has not been notified, and she

1  does nothing.

2  She tells no one, and when it comes time for

3  the six-month post-placement, as she is well aware in

4  every intercountry adoption are required from the family,

5  there is no post-placement report for the child with the

6  Tufts family.

7  One is submitted late and is not at all in

8  line with the appropriate requirements of post-placement

9  report.  Yet, no disclosure is made at the time.  The

10  first disclosure, as your Honor is aware, April 2016, and

11  that one contains false statements, lies,

12  misrepresentations.

13  Now, your Honor, in the sentencing

14  memorandum for the defense, there is a reference that

15  this was not submitted by Margaret Cole.  In the

16  Government's supplemental exhibits and as testified to at

17  trial, the only other employer whose name is identified

18  there on the 2016 report, she would not have submitted

19  anything to COA without the direction and authority of

20  Margaret Cole.  So whether or not she pressed "send," she

21  caused the information to be made and false statements to

22  be made.

23  With respect to the August 2016, false

24  statement to COA, your Honor, several things speak

25  volumes with respect to that.

First of all, it starts out by saying "we
are not being investigated," again highlighting what was
at the forefront of the Defendant's mind at the time; was
not the injuries that had been sustained by this orphan
but what was happening to her agency.

This is also referenced in the 302 report of
the Utah family where they said when they spoke to the
Defendant after learning what happened to the older
child.  She said this is going to ruin my agency."  And
indeed, at that point, as the Government has provided
exhibits and highlighted and elicited at trial, Poland
was more than 40 percent of the revenue for her business.

Accreditation was pending in foreign
countries, in that country and other countries, and it,
indeed, would have a significant effect on her business.
But instead of being honest at that point, she continued
to lie.  She claimed the date of incident was August 30th
of 2016 when, in fact, she had been notified weeks
earlier, and this is significant because an injury like
this must be reported within 48 hours.

She deliberately indicated the date as being
within the 48-hour reporting requirement.  This was not a
technical or accidental mistake as she has admitted under
oath; this was knowingly and willfully done intending
that the fraudulent statement would influence COA and the

1    Polish authorities.

2    And the December 2016 letter to the Polish

3    authorities, your Honor, in her sentencing filings, she

4    references this was drafted by an attorney, and it may

5    have been drafted in consultation with an attorney, but

6    certainly, Margaret Cole had significant involvement, and

7    her attorney would only know what to write based on the

8    information she shared.

9    Indeed, in Government's Exhibit J there is

10   an e-mail communication chain between her and her

11   attorney, and what her attorney says "you must read all

12   of it to be sure it says what we want," followed again by

13   inquiring "did they have an approved home study?"

14   So acknowledging the importance of the home

15   study and the fact it was not done.  Following that the

16   Defendant and her co-conspirator exchange e-mails in

17   which the Defendant says to her with respect to the

18   letter "let's do it ourselves.  I will send you what I

19   wrote for the training part."

20   So despite her efforts to minimize her

21   involvement in this lengthy letter and repeated false

22   statements, she was directly involved and deliberate and

23   was given to the Polish authorities.

24   As referenced earlier by my colleague,

25   intercountry adoption is a system based on trust.  COA

1   has to rely on the integrity of the agencies and

2   directors like Margaret the Cole.  Certainly, the

3   authorities, as Mr. Pedgorski detailed in his statement,

4   rely on the trust and integrity and trust of people like

5   Margaret Cole.

6           When it is abused, there are far-reaching

7   damage as has been evidenced here.  The victims, as your

8   Honor highlighted, include the older child who, while it

9   is fortunate that the Utah family fought to have her back

10  in her family and they are working everyday to make sure

11  she has a good life, she will never recover from what she

12  suffered.

13          The Utah family themselves, as detailed in

14  their victim impact statement, feel betrayed, have lost

15  trust.  It has permanently -- hopefully not

16  permanently -- but severely damaged their entire family.

17          The other families that were pending

18  adoption in Poland at the time that Margaret Cole led

19  this conspiracy, they are also victims.  They as outlined

20  in the statement from Mr. Pedgorski and the State

21  Department, they either were delayed in their adoptions

22  or could not adopt any children at all.

23          And certainly, international relations were

24  affected as detailed by the State Department and

25  Mr. Pedgorski in his statement.

1    Now, this was not with respect to the

2    3553(a) factors, and the nature and characteristics of

3    the Defendant, certainly, the Government acknowledges she

4    has done good things in her life.

5    There are families here she has created

6    because of her work and adoption.  The Government does

7    not dispute that, and all of the people that wrote

8    letters during the time in the Russia program, the

9    Government does not dispute that those are good acts she

10   has done.

11   But of note, all of those letters in support

12   are from up through the mid 2000s.  After the Russia

13   program closed, things changed at EAC.  That was a large

14   basis of revenue for EAC, and it was not until the Poland

15   program that there were European countries that EAC felt

16   they could do adoption with, and that is why the Poland

17   program was so important for EAC and the motivation for

18   this year-long deceit and fraud.

19   With respect to the Defendant's background

20   and characteristics, your Honor, she is educated.  She

21   attended a year of law school.  Certainly, as I

22   referenced, she has done some good acts, but that does

23   not eliminate or avoid the seriousness and extent of the

24   harm done here.

25   With respect to her medical conditions, your

1  Honor, the Government submits that they all can be

2  treated in the Bureau of Prisons.  There is nothing, at

3  least based on the limited amount of medical records the

4  Government received, that cannot be treated in custody.

5      There was reference to ongoing screenings,

6  medications, and certainly other cases in this Circuit,

7  in this District, including the Barro case, have

8  individuals that have similar conditions that have

9  received custodial sentences.

10     With respect to COVID and the argument that

11  she would be eligible for compassionate release, all of

12  the cases cited by Defendant were prevaccination, and

13  courts have routinely denied extraordinary and compelling

14  reasons for compassionate release when the Defendant has

15  been vaccinated, and the 3553(a) factors do not warrant

16  it as they do here.

17     Touching briefly on sentencing disparities,

18  your Honor, as you are well aware, her co-Defendant

19  Robin Longoria, who is certainly less culpable and pled

20  guilty years earlier, received a sentence of 12 months

21  and one day.

22     THE COURT:  Are you familiar with the JSIN?

23     MS. RICE:  I am, your Honor.

24     THE COURT:  And the final offense level of

25  14 with a Criminal History Category 1, are you familiar

1    with what the median and average sentences are?

2              MS. RICE:  I am not for offense level 14,

3    your Honor.  I had calculated that based on offense level

4    16, which the Government submitted we believed was the

5    Guidelines calculation.  So I can't speak to offense

6    level 14.  Certainly, if your Honor has that figure --

7              THE COURT:  81 percent of people received

8    imprisonment that came under that Guideline at that

9    offense level and Criminal History Category, and the

10   average length of incarceration was 11 months.  The

11   median was 12 months.

12             So it appears that the broad majority of

13   people in her Criminal History Category and her offense

14   level received incarceration, and it ranged somewhere

15   around 11 or 12 months.

16             Is there some argument given her age it

17   should be somewhat lower.

18             MS. RICE:  No, your Honor, it is not unusual

19   for first time fraud offenders to be older, and

20   certainly, at the time that she --

21             THE COURT:  Somewhat older than the median

22   age, but it is somewhat unusual at her age, right?

23             MS. RICE:  Again, yes.  Somewhat older than

24   across all fraud offenses in this District, yes.

25             THE COURT:  So relative to -- is there any

1    real argument for specific deterrence to be a factor?

2              MS. RICE:  Specific deterrence, your Honor,

3    no.

4              THE COURT:  And relative to general

5    deterrence, is that kind of a weak factor?  How many

6    people are going to hear about whether I give a longer

7    sentence or shorter sentence?  How many people are really

8    going to hear and otherwise be deterred?

9              MS. RICE:  Your Honor, I would respectfully

10   disagree.  The general deterrence is of utmost importance

11   here because -- and I can't state it better than Ms. King

12   from the Department of State said -- "countries in

13   international organizations around the world have taken

14   note of Ms. Cole's actions and how she has exploited the

15   intercountry adoption for her own personal gain."

16             General deterrence is important in all white

17   collar cases and fraud cases and absolutely is important

18   here.  Intercountry adoption is a system based on trust,

19   and as the Defendant has referenced, the statute she pled

20   guilty to has not had a conviction before.

21             So highlighting that this type of conduct in

22   years of lies and false statements to foreign and U.S.

23   authorities will not be stood for.  So respectfully, your

24   Honor, the Government submits general deterrence is very

25   important in this case.

1          And with respect to the sentencing

2    disparities, your Honor, just briefly, thank you for

3    those numbers, certainly, the Government believes that

4    there is no basis to disparity or varying from the

5    Guidelines or from these average and median sentences nor

6    from the sentence of her co-conspirator.  It is not

7    unusual for first-time offenders to not have a criminal

8    record.  Indeed, in 2020 71.8 percent convictions --

9          THE COURT:  That's almost given.  I think

10   the statement was it is not unusual for first-time

11   offenders not to have a record.

12         MS. RICE:  I'm sorry, your Honor.  For

13   individuals convicted under 2B1.1 to be first time

14   offenders is what I meant to say.

15         THE COURT:  Okay.

16         MS. RICE:  And the statistic was that 71.8

17   percent of individuals sentenced under the fraud

18   provision 2B1.1 were first-time offenders.

19         So the fact that she is not -- does not have

20   a Criminal History does not place her in an unusual

21   situation for a fraud offense.

22         Finally, with respect to 28 U.S.C., Section

23   994(j), which the defense references multiple times in

24   their sentencing memorandum, the Sixth Circuit has

25   repeatedly said that's a directive to the Sentencing

1    Commission, not to the judicial officers.

2                    Indeed, the Guidelines were created

3    substantially, in part, to address disparities in white

4    collar offenses.

5                    THE COURT:  Let me ask you, generally with

6    B1.1, she ends up at a 14 with a Criminal History

7    Category I.  Because of the way 2B1.1 operates, wouldn't

8    most of the people that end up at 14, Criminal History

9    Category I, wouldn't most of them be kind of larger

10   dollar volume fraud Defendants where the conduct may well

11   have involved significantly more money than this case?

12                   MS. RICE:  That may or may not be the case,

13   depending on the enhancements.  Certainly, that could be

14   the case where there was lower dollar amount, and there

15   were a number of victims or there were sophisticated

16   means, so not necessarily, your Honor.

17                   I don't think that only because it is under

18   B1.1 means that there is significant dollar loss here,

19   but the Government is not disputing the dollar loss here;

20   that there is no dollar loss.

21                   However, the damage and the seriousness of

22   this offense cannot be measured in dollars.

23                   THE COURT:  Are you seeking any restitution?

24                   MS. RICE:  No, your Honor.  The victims

25   haven't requested restitution, and it is the Government's

1    position that those figures would be too difficult or

2    complex to calculate.  We concur that any harm suffered

3    by the older child would be too difficult to calculate

4    any restitution.

5              So no, your Honor, we are not seeking

6    restitution from Margaret Cole.

7              There were requests made from victims

8    related to the relevant conduct in the Uganda scheme, but

9    the Government is cognizant that she has not been

10   convicted of those.  While they are relevant and speak to

11   her character and the Court may consider all relevant

12   conduct for sentencing, we are not seeking restitution.

13             THE COURT:  Okay.  Let me give counsel for

14   the defense an opportunity to make argument.

15             MS. RICE:  Thank you, your Honor.

16             And I would just reference again the victim

17   impact statements from all of the victims, including the

18   State Department and Mr. Pedgorski from Polish Central

19   Authority.

20             Thank you.

21             MR. SEARBY:  Your Honor, we would also ask

22   to have the opportunity to have several individuals

23   address the Court at this time.

24             THE COURT:  Pick two that you want.

25             MR. SEARBY:  Your Honor, I am going to have

1    a tough time when I walk out of here talking to the third

2    one.

3                    THE COURT:  Flip a coin.

4                    MR. SEARBY:  All right.  We will start, your

5    Honor, with Alex Rokakis.

6                    MR. ROKAKIS:  Good morning, your Honor.  May

7    I remove my mask?

8                    THE COURT:  Yes.

9                    MR. ROKAKIS:  Thank you.

10                    My name is Alex Rokakis.  I will be brief,

11    your Honor, as I have expressed my thoughts and my letter

12    to the Court earlier this month.  You have hundreds of

13    pages from this file, including letters of support for

14    Margaret Cole and letters from victims and testimony

15    today from a victim.

16                    Perhaps it is inappropriate for me, a

17    33-year former member of the Office of the U.S. Attorney

18    and a person who has not seen the entire file, to

19    advocate for leniency for Margaret Cole, but regardless

20    here I am today to speak on her behalf and argue for

21    leniency.

22                    In the United States, we don't have

23    orphanages anymore, your Honor; we have foster homes.  We

24    no longer have orphanages.  They have long fallen by the

25    wayside.  We have these foster homes where children

1 without parents are cared for.

2 But I have been to orphanages in Moscow

3 where you walk in the door where the children are clothed

4 and fed but not loved. You walk in the door, and they

5 run up, and they throw their arms around you because,

6 they want you to take them home and become their mama and

7 or their papa.

8 I have seen these children, and I have

9 adopted two of them. I know what good Margaret Cole has

10 accomplished. Over 8,000 lives have been changed for the

11 better; 8,000 adults that would have grown up unloved and

12 turned out into the streets to fend for themselves.

13 My own son might have been conscripted into

14 the Russian Army and been forced to fight in the Ukraine.

15 Margaret Cole may have lost her adoption agency, but she

16 has the eternal gratitude of thousands of people like

17 myself who are forever in her debt.

18 Since a search warrant was executed on her

19 home and business and she was indicted five years ago,

20 she has suffered greatly. I pray that the good she has

21 done outweighs the mistake she made on this one adoption,

22 your Honor, and you take that into consideration.

23 Thank you, your Honor.

24 THE COURT: Thank you.

25 MR. SEARBY: Mr. Mack?

1          MR. MACK:  Good morning, your Honor.  My

2     name is Dave Mack.  I am from Chicago.  I and my wife

3     adopted three children at different times, through EAC

4     and with the help of Margaret Cole, and she changed our

5     lives.

6          THE COURT:  What years?

7          A JUROR:  I'm sorry.  What years did we do

8     it?  This was in the former Soviet Union, so it was '92

9     and '94, '92 and '94.

10          THE COURT:  Go on.  I just was trying to

11     give context to your comments.

12          MR. MACK:  The former Soviet Union was the

13     place.  Our son was an infant, and he was in Penza,

14     Russia.  Our middle daughter was two and-a-half, and she

15     was in Kazakhstan, and our third daughter is the one in

16     1994, is from Moscow, an orphanage in Moscow.  She is the

17     one who wrote you a letter about her experience.

18          She is in South Korea with the U.S. Army as

19     a captain.  I am here really to talk about, as Alex did,

20     the accomplishments and the good deeds that Margaret

21     really did.  She changed lives with the 8,000 children,

22     and I want to put in order of magnitude on the 8,000 plus

23     children.

24          It was over a 24 to 25 year period 8,000,

25     slightly less than one child for everyday in that 24, 25

1    year period.  So it was quite a body of work.

2            My particular children had lots of medical

3    issues.  We have been able to deal with those issues, and

4    they are all on their own.  They are adults.  They are on

5    their own financially, and I would say that the key to

6    this is the children that she has helped, that have

7    gotten adopted ended up in a better place than where they

8    were.  That is huge.  And I feel -- I feel that should

9    weigh something in the sentencing that you are going to

10   give for Margaret Cole.

11           Thank you.

12           THE COURT:  Okay.  Thank you.  Do you have

13   any argument before sentence is imposed?

14           MR. SEARBY:  I do, your Honor.

15           THE COURT:  She will get a chance after you.

16           MR. SEARBY:  Okay.  Thank you, your Honor.

17           Your Honor, may it please the Court, the

18   Court asked the Government questions under the 3553

19   factors regarding general deterrence.  There is no issue

20   of specific deterrence.  My client is not a threat to

21   anyone and is no longer involved as a result of the

22   Government's debarment in the adoption industry.

23           I think as the Court got a flavor during the

24   Daubert hearing, Mr. Berger, I have learned through this

25   case that the world of international adoption is a small

1  world, and what happened has happened to Ms. Cole is well

2  known throughout that community.  And regardless of the

3  sentence the Court imposes, this has become a cautionary

4  tail.  And no one wants to go down the road Ms. Cole has

5  been down.

6  Unfortunately, as you've heard today from

7  two people and we could have brought many, many former

8  clients to talk about what has happened, Ms. Cole's life

9  has been defined by an adoption that went terribly wrong,

10  not the thousands and thousands that went right.

11  And as I listened hand to the conversation

12  between the Court and the Government and the Court

13  rightly talked about the dilemma faced by the Poland

14  clients and also faced by Ms. Cole, which she stepped

15  into this situation, which was not of her own making, it

16  should also be appreciated that these children in Poland

17  were eligible to be adopted because, as was stated in the

18  documents that were translated from the Polish

19  government.

20  There were not individuals in Poland, that

21  after six months that were willing to adopt them.  It was

22  at that point the Polish government was willing to have

23  them adopted from abroad.

24  And of course, in the 302 you see the

25  concerns for the condition of the children on behalf of

1    the Poland clients, which influenced their position,

2    which was steadfast, that they were unwilling to leave

3    the children in Poland.  And that was really one thing

4    they were certain about.

5            The government talked about in that 48 hours

6    the Polish government could have been contacted.  Yes,

7    they could have been contacted, but the problem again,

8    borne out by the FBI 302, the parents had made their

9    decision.

10           In fact, they hadn't made a final decision

11   when they left Poland.  They made that decision at

12   Charles DeGaulle Airport.  According to what they said at

13   the FBI in the 302 after they had a bad night and they

14   finally decided that they could not parent both children,

15   but during the 48-hour window, whether it is 48 hours, 72

16   hours that the government talked about, they had not made

17   a final decision and would have been inappropriate of my

18   client at that point to notify the Polish government.

19           Ms. Cole did not get involved in the events

20   that lead her to be before the Court today to commit a

21   crime.  She became involved because the Polish clients

22   asked for her help, and again, they believed she acted in

23   good faith.

24           We accept responsibility that Ms. Cole

25   exercised poor judgment with reporting from those moments

1    forward, and the offense conduct, the stipulated conduct
2    in the plea agreement speaks to that, and we accept that
3    her disclosures to the interested parties were sometimes
4    late.  They lacked candor, but there were disclosures,
5    and events were made.
6            THE COURT:  Wouldn't she -- wasn't she
7    largely covering herself?
8            MR. SEARBY:  I think, your Honor, there was
9    a motive in the end to deflect blame here.
10           THE COURT:  I mean, maybe the most
11   unseemingly is you have got this 5 year-old girl who
12   seemingly is brutally raped.  Is a 5 year-old that
13   seemingly has gone through a medical examination before
14   she ever leaves Poland.
15           And this child is to some degree torn apart.
16   And your client's first reaction is to basically claim it
17   must have happened in Poland at a time when the nurse
18   that examined the child obviously said no way, shape,
19   form.  Was this something that happened before?
20           Your client did that two or three times,
21   basically blaming it on some rape in Poland and rather
22   than accepting the fact that Parris had done it.
23           MR. SEARBY:  The Parris relatives.
24           THE COURT:  The Parris relatives in Texas.
25           MR. SEARBY:  Right.  And I understand the

1    Court's concern, but let's put it in context; that in the

2    disclosures where my client obviously placed an emphasis

3    on the evidence of potential prior abuse in Poland, not

4    in Texas --

5              THE COURT:  What evidence was that?  You

6    know, I looked, and the child's statement was something

7    to the impact that somebody in Poland had hit her foot.

8              MR. SEARBY:  Yeah.  The Poland clients noted

9    the injuries to the foot.  That's not what was at issue.

10   What my client did in the disclosures and it is important

11   is with her statement she forwarded the report from the

12   detective in Texas.

13             THE COURT:  Yeah, but didn't she to a major

14   degree try to give an explanation that was completely

15   different?

16             MR. SEARBY:  No.  I would not say that she

17   tried to give an explanation that was completely

18   different.  She noted there were new injuries and old and

19   I think at its worst --

20             THE COURT:  Let me find that because for the

21   life of me I don't remember her saying new injuries.

22             MR. SEARBY:  But the point is the document

23   forwarded with her communication was, in fact, the police

24   report from the detective, which talked about the new

25   injuries, which could not have occurred in Poland.

1          THE COURT:  Right.  Absolutely.  So why

2     would she bring them up in the letter to both the Polish

3     officials and the letter to the detective?

4          MR. SEARBY:  Well, your Honor, again, I am

5     not trying to excuse the way it was written, but the

6     information was provided from the detective, the full

7     complete report, and Mr. Roberts, in fact, contacted the

8     detective before trial to make sure that that report from

9     the detective was complete and accurate to what the

10    detective prepared.

11          And that report talks about old injuries and

12    new injuries.  You know, the way that the old injuries

13    were emphasized, I understand the Court's strong

14    disagreement with that.  And that's why we are here.

15          But in that very same communication, if

16    someone read the full communication, they would see the

17    information as to the new injuries and the fact that the

18    Parris relative --

19          THE COURT:  She gives an explanation, and I

20    am looking at the document.  "Because there was evidence

21    of old healed injuries that occurred before the adoption

22    we didn't think that the issue raised in Detective

23    Breen's letter regarding past sexual and physical abuse

24    of the child and his report, that there was evidence of

25    healed injuries that were possibly several years old was

1    reportable to the ministry."

2            She doesn't say anything about the new

3    injuries.

4            MR. SEARBY:  But she attaches the

5    detective's report to it.  I don't have in front of me

6    what the Court is reading from, but I am not disagreeing

7    with you.  I just believe that that communication also

8    forwarded the report.

9            THE COURT:  And then, she goes on to say

10   "immediately upon learning of the August 2016

11   hospitalization, I telephoned my representative in

12   Poland, and a report was made about the possible injury

13   and abuse in Polish foster care."

14           So she is deflecting them from appreciating

15   that the rape and the terrible injuries to this child

16   occurred in Texas, not in Poland.

17           MR. SEARBY:  I would agree with the Court,

18   she is placing emphasis on the old injuries, but -- I

19   mean, the detective's report talks about both, but

20   obviously, new injuries were significant and could have

21   only occurred in Texas, and we agree with the Court on

22   that.

23           THE COURT:  When did she have the nurse's

24   notes?

25           MR. SEARBY:  Your Honor, I am not certain of

1    the exact date or that she did, in fact, have the nurse's

2    notes.  What I believe she had was detective Bearden's

3    report, but I am not certain on that question.

4              THE COURT:  Do you remember the nurse's

5    notes what document that was?

6              MS. RICE:  Your Honor, there was a news

7    article that detailed the substance of the assault and

8    the abuse dated October 2016.

9              THE COURT:  Yeah.  And she had gotten that

10   from the person, her representative in Poland, right?

11             MS. RICE:  Correct, your Honor.

12             THE COURT:  Do you know if she ever got the

13   nurse's examination notes?

14             MS. RICE:  Your Honor, we don't know if she

15   got the actual notes, but the article includes the

16   medical information, and your Honor, also Government's

17   Sentencing Exhibit C, the August 2016 COA report,

18   Margaret Cole writes, "this incident appears to have

19   occurred in Poland."

20             MR. SEARBY:  I apologize, your Honor.  I was

21   verifying that my client did not have the nurse's notes.

22             THE COURT:  Okay.

23             MR. SEARBY:  But I don't think she needed

24   the nurse's notes.  I think the detective's report said

25   it all.

1          But there were two issues here:  The major

2     issue was, I think the Government and Poland would want

3     to know that one of its children was grievously harmed.

4          The other issue was the extent to what the

5     detective said, not simply my client, that there was

6     prior injuries.

7          I think there was an ethical duty to report

8     that, and that was reported to Poland in August, but

9     reporting the old injuries doesn't in any way excuse or

10    deny the new ones.  It can't logically, if you study, the

11    nature of the injuries.

12         Your Honor, if I could, I would like to

13    address the fact that Ms. Cole's involvement in this

14    event was not for personal profit.  She was involved

15    because she was asked to help.

16         The Government has suggested that it was a

17    profit motive to deflect blame in order to protect the

18    Poland program because it was such a significant part of

19    the business.

20         THE COURT:  Let me take you back to her

21    letter to the Polish authorities.  She begins on page 5

22    "we would like to briefly address the situation with the

23    child in Denton, Texas.  Unfortunately, this past August,

24    after they adopted the child, the child was injured under

25    circumstances that seemed to implicate the father.

1    However, at this point, he has not been formally charged

2    with a crime and may very well be innocent of all

3    criminal acts.

4            "He has a clean criminal record and has no

5    history of violence, has passed a polygraph test

6    regarding the injuries, and there doesn't seem to be

7    conclusive evidence even that a crime has been

8    committed."

9            At a time when this child was using some

10   kind of colostomy bag.

11           MR. SEARBY:  That's correct, your Honor.

12   The emphasis given that the individual may be innocent,

13   the individual went to trial later.  He was convicted.

14   There was a defense in the case.

15           So your Honor, we are not here -- we are

16   here before the Court because there were disclosures that

17   were made.  Obviously, if we could go back in time,

18   obviously, Ms. Cole would have made those disclosures.

19           We are not here to defend what she has done

20   but to accept responsibility.  We are here to say these

21   events around this adoption were an aberration and a life

22   well lived in helping other people.

23           THE COURT:  The Government makes an argument

24   that she engaged in this conduct basically because the

25   business was failing, and she was extremely concerned

1    that if she got kicked out of Poland by failing to

2    complete an adoption that she wouldn't be able to keep

3    the business going.

4            Is there some support for that argument in

5    the --

6            MR. SEARBY:   Your Honor --

7            THE COURT:   I was going to point you to

8    paragraph 89 of the presentence report.

9            MR. SEARBY:   Your Honor, what we would say

10   is the following:

11           If you had heard from our third individual,

12   Mr. Benderson, I think what he wanted to talk about with

13   the Court were the strong reasons why he came to believe

14   after offering money to Ms. Cole to build the EAC, he

15   came to believe that her primary motive was not

16   financial; it was the pride in building this agency.

17           So clearly, she was trying to deflect blame

18   as the Court points out as to the disclosures that put

19   her before this Court for sentencing today, but I think

20   the argument from the Government that it was purely a

21   financial motive is simply putting the worst spin on it

22   possible.   I think the reality, if you looked at the

23   state of her business, she personally did not profit from

24   her business in the final years.

25           THE COURT:   We have 2016.   I am looking at

1    paragraph 89, which you are correct, it looks like after

2    2016 looks like she has lost money every year except for

3    2020.

4              MR. SEARBY:  She did, your Honor, and she

5    took -- I believe the number is $300,000 from an

6    inheritance and put it in EAC to keep it going.  The

7    reason she did that is summed up in the one picture in

8    our sentencing memo that shows -- in that picture, it is

9    more like hundreds -- it would come back to Strongsville

10   every year in appreciation and celebration of adopting

11   their children, and she wanted to keep it going.

12             The reality is the Poland program, contrary

13   to the Government's chart, was a small percentage at that

14   point of the fees that they were going to get.  And as I

15   understand it from my client, that China and India

16   programs after the Russia programs closed because Russia

17   stopped doing international adoptions, not because of any

18   issue involving EAC but the China and India programs

19   dwarfed the Poland program.  So I don't believe my

20   client's motive was trying to get rich.

21             In any event, she comes before this Court at

22   the age of 74 with no prior Criminal History.  She lived

23   70 years of her life without committing an offense for

24   which she was convicted, and as federal courts

25   recognized, that says something.

1          She lived a law-abiding life until this

2     event, and again, she helped so many people.  One of the

3     letters that really resonated with me was the letter

4     written by Mr. Mack's daughter, who is now a captain and

5     adopted from Eastern Europe and a captain in the

6     United States Army stationed as I understand in Korea

7     pursuing a Masters.  She wrote that letter from Korea on

8     her own initiative to emphasize to the Court where would

9     she be but for my client's interests on her behalf.

10          So I think the law is clear that you

11    sentence the whole individual, not simply the crime.

12          THE COURT:  So the Sentencing Guidelines, do

13    those emphasize the nature of the offense,

14    overemphasizing the background of the offender?

15          MR. SEARBY:  Your Honor, the question, it

16    was a question the Court put to the Government in some

17    sense, that fraud Guideline puts us in a place that

18    overemphasizes --

19          THE COURT:  What I am inartfully or clumsily

20    going at, doesn't federal sentencing follow Kahn's

21    argument that you punish the crime more so than the

22    offender and does not follow the Benthem argument that

23    punishment should be more forward looking?

24          MR. SEARBY:  Your Honor, I believe with the

25    3553 factors with the Supreme Court's decision in Booker,

1    we reached a point -- and this Court has substantial

2    discretion to decide where this goes, in my day, the

3    Sentencing Guidelines were pretty much where it began and

4    ended, my days with the Government.

5           But no, I believe we should sentence the

6    whole individual.  We have in this country a problem of

7    overincarceration.  Millions of Americans are behind

8    bars.  And I think the Court mentioned 28 U.S.C. 944.

9           Yes, that statute may have been a directive

10   from Congress to the Sentencing Commission, not to the

11   courts, but it was a recognition on the part of Congress

12   that imposing a sentence of no imprisonment is generally

13   appropriate where you have an individual that comes

14   before the Court with no prior Criminal History,

15   particularly where it is an individual like Ms. Cole who

16   poses no threat to society going forward.

17           I believe that this Court can fashion a just

18   punishment through various means at the Court's disposal

19   that is a better use of resources and doesn't warehouse

20   another individual behind the bars in the United States

21   who doesn't need to be there.

22           As we have talked about, I think her health

23   issues are significant.  I think she needs ongoing

24   medical care.  Yes, the federal prison system, I believe

25   it is Butner, but I may have remembered that wrong, has a

1    medical facility, but I have also had clients and

2    cooperating witnesses and other individuals over my

3    career that have gone there, and it is not the medical

4    care we would want with an individual who actually has

5    two tumors in her brain, hypertension.

6         The tumors aren't malignant, but she needs

7    to be followed to make sure that doesn't change.  She

8    suffers from vertigo, suffers from post traumatic stress

9    disorder, and due to hypertension and her age, she is

10   vulnerable to COVID.

11        Yes, we have vaccines, but as this Court

12   knows, vaccines give us protection, but they are not fool

13   proof.  We all know people who have had every vaccine

14   they could get, who had become very sick from COVID, and

15   behind bars it is very hard to isolate yourself from

16   other inmates and to protect yourself from infection.

17        So based on all those factors, we would ask

18   the Court to fashion an alternative sentence and vary

19   below the Guidelines.

20        And a reference was made to the fact that

21   Ms. Longoria received a year and a day.  Well,

22   Ms. Longoria, the starting point for her sentence was a

23   level 19.  Ms. Cole is at a level 14.

24        I disagree with the Government when they say

25   Ms. Cole is more culpable than Ms. Longoria.  I don't

1  believe that that's true.  I think that Ms. Longoria and

2  Ms. Moran had the direct involvement in the program in

3  Africa.  The individual that spoke to the Court today was

4  talking about Africa.  Ms. Cole during this stage was

5  withdrawing from day-to-day management.

6          And the Government had the opportunity and

7  certainly the will to charge Ms. Cole with the conduct in

8  Africa as they did these other defendants, and they

9  didn't do it.  They had years to make the case and even

10  able to avoid the privilege and read Ms. Cole's

11  communications with her lawyers, and still they did not

12  charge her.

13          In fact, they agreed in the plea agreement

14  not to bring further charges.  And as I look at the

15  conduct here, setting aside the event which happened,

16  which was not foreseeable to Ms. Cole, was not -- she was

17  not the proximate cause of the harm to the child and

18  however horrible, she was not the one responsible for it.

19          The conduct to me that is most troubling are

20  the allegations in relation to Africa, and I will end

21  what Poland clients said about her because I think she

22  said it well.  She said, you know, Ms. Cole was a good

23  person who tried to help her but was a poor manager of

24  people.

25          THE COURT:  Thank you.  Is there anything

1    you want to say, Ma'am?

2            THE DEFENDANT:  Okay.  Thank you, your

3    Honor, for allowing me to try to explain some of these

4    and why it would never happen in the future.

5            I would like to start with one Mother's Day

6    weekend was as horrible as a mother could have.  I woke

7    up to the fact that my baby daughter died in her sleep;

8    SIDS.  Baby Alicia's death was the birth of the EAC.  My

9    passion and goal was to save the lives of children.

10           This grew to 8,000 orphans celebrating

11   Christmas with their family.  I made mistakes wrongfully

12   helping this Poland family.

13           At the time -- and they keep talking about

14   48 hours -- at the time, there was no law that said you

15   have to do within a certain period.  How in 2020 there

16   was a proposed law -- I think the lawyer talked to you

17   about it -- and now nobody, including myself, would have

18   been able to do or would want to do what I did, and that

19   was the help the lady who asked me for help.

20           The rule is now 24 hours.  After you suspect

21   a disruption you report it, central authority, country of

22   original.  So if that law would have been there in those

23   days, you know, I wouldn't be here.  So anyway, the

24   procedures are different.  As far as that medical report,

25   I know I am not supposed to talk about it, but I just

sent that medical report over, the Denton medical report
over to Poland immediately about total worry about kids
being raped in Poland as this little girl was kept in the
cage and raped according to the report and according to
her own testimony, to somebody here.

So therefore, the idea I was hiding it from
the Government, I was not hiding.  I was reporting to try
to get help for the kids over there.  Okay?

So I am sorry about that that I didn't get
the words right.  I was short on staff.  She was right
about the management.  All right.

Now, I am very -- although I made these
serious mistakes in Poland, I am really very sorry for
what happened, but look at the good I did.  I worked 24
years as hard as I could work to save as many orphans as
possible with my little Alicia angel with me.  These
children were the joy of my life.  My mom worked with the
agency, too, and we called them "our kids."

We enjoyed those picnics, and we had a
little sign that said, "have you saved the life of a
child today?"

That was a plaque on my wall.  Seeing these
children and opening the Holiday cards was an event that
nobody ever gets in a job.  It was a wonderful job.  I
did not do this for financial gain, except I got a

paycheck, but as the lawyer already explained, my last
four years, I basically was a volunteer because my
paycheck was about the same as the $300,000 that I
donated.  I donated that because Russia closed, and we
needed a boost.

We were working on this India program, which
was huge and wonderful.  Many young children needed
homes, and we recently got a license, so I spent most of
my time on that and stepped away from the other and had
hired Debra Parris who was a great worker for another
agency for 20 years, totally qualified to do the job
according to Gladney & Associates.  And she also had
experience in Africa and domestic adoptions, so I
considered it a find because I would not have to worry
about that.

Your Honor, I have been in community
confinement since August of 2020.  I live in the country
with my Amish neighbors.  I eat in restaurants maybe
three times a year.  I don't go to malls or crowded
places.  I am vaccinated for COVID, but I am very afraid
that I am not resistant to getting diseases at my age.  I
have been getting sick and my daughter who is a hospice
nurse has taken me to the hospital twice, November and
February for things, and then they start scanning my
brain and giving me things.  So this has been hard on me

1    because of all these problems.

2            So I beg you to please consider a sentence

3    of some kind of probation or home confinement or whatever

4    is possible as punishment for this case, so I can help my

5    family.  My son needs help.  We recently planted a

6    garden.  He is diabetic and special needs.  You know, you

7    read in the report and the other thing.  And so we want

8    to spend time together and hopefully working on improving

9    my health and his.

10           So I would like to put this financially and

11   physically devastating last five years behind me.  I

12   loved the 24 years before that, and I feel very blessed

13   to have had the opportunity to save 8,000 children.

14   Every time I think about it, I smile.  You have to smile

15   when you think about those children that you saw at the

16   picnics.

17           So again, I am very sorry for all the harm I

18   caused and by my mistakes I made.  And this is not a

19   situation that would ever happen again.

20           As the EAC is closed and no other adoption

21   agency would make that mistake because of the new laws.

22           Thank you, your Honor.

23           THE COURT:  I have set the offense level and

24   the Criminal History Category.  I also consider the 3553

25   factors.  First among those is the nature and

1    circumstances of the offense.  The Defendant founded and

2    ran an adoption consulting agency, which was based in the

3    Northern District of Ohio, but it conducted international

4    adoptions, especially those involving Poland and Uganda

5    during the relevant time periods.

6              The background of the offense was that the

7    Defendant was involved with making false statements and

8    facilitating false statements to the Polish adopting

9    agencies and United States controlling agencies.

10             The Defendant attempted to cover up the

11   transfer of a child that was brought from Poland and then

12   suffered sexual abuse at the hands of somebody the child

13   should never have been placed with.

14             The location that the child was transferred

15   had never undergone a home inspection, and the Defendant

16   skirted over this and misrepresented that the child was

17   going to be housed in Utah.

18             I also consider the Defendant's history and

19   characteristics.  She is 74 years of age, Criminal

20   History Category I.  She doesn't have any past scorable

21   criminal record.  She also does not appear to have any

22   prior arrests.  Those factors work to her benefit.

23             She also had operated this agency for a

24   large number of years with some success, both to herself

25   but perhaps more importantly for the number of adoptions

1    that she assisted facilitating.  This was a business, and

2    she made significant amounts of money and charged

3    significant amounts of money to clients.

4            So in many ways.  It was certainly not a

5    charitable endeavor, but she nonetheless facilitated a

6    large number of adoptions that were of significant

7    benefit to the adopted children and to the families that

8    received these adoptions.

9            She has a number of significant medical

10   conditions that make her at some risk for adverse medical

11   issues.  She also has some psychological issues, but most

12   of those seem tied to this case; no issue of substance

13   abuse.  She has a bachelor of science degree.

14           I also consider the need for the sentence to

15   reflect just punishment, afford adequate deterrence,

16   protect the public, and reflect the seriousness of the

17   offense relative.

18           Relative to deterrence I don't think there

19   is an issue of specific deterrence.  I think there is

20   only a marginal issue of general deterrence.  I don't

21   think the sentence I give in this case will have a

22   significant deterrent effect one way or the other.

23           I do focus though, there is a need to impose

24   just punishment.  And part of that is retribution for the

25   harm that was visited upon this poor child by the

1    Defendant's conduct, which would have, if the Defendant

2    had not engaged in this conduct, it is unlikely that the

3    child would have suffered the problems that the child has

4    had.

5              I also need to consider the issue of

6    disparities, and I have given earlier -- recorded the

7    number of people incarcerated.  The broad majority were

8    sentenced to a period of incarcerations, and the average

9    was somewhere in the range of 11 to 12 months.

10             So having considered all these factors, I am

11   going to sentence the Defendant to three months of

12   incarceration.  I am going to then put the Defendant on

13   three years of supervised release.

14             As one of the conditions of the supervised

15   release, I am going to require for the 12 months

16   following her release from incarceration, I am going to

17   require that the Defendant be subject to home

18   confinement.

19             She will be permitted to leave her home

20   during those 12 months, only to attend medical treatment,

21   attend religious services, or if she has gotten prior

22   approval from the supervising probation officer.

23             I will impose a fine of $7,500, which would

24   be payable immediately.  There will also be the

25   imposition of $200 special assessment.  Relative to the

1    fine, she will be required to pay that immediately.

2              If not paid immediately, she will be

3    required to make payments of not less than 10 percent of

4    her gross monthly income.  While she is under supervised

5    release, she is not to violate any other state, federal,

6    or local law.  She will be subject to the standard

7    conditions, but she will, given her background, I won't

8    require that she provide the drug screening that is

9    typically required of offenders.

10             So that would be the sentence of the Court.

11             Does the United States have any objection?

12             MS. RICE:  Your Honor, we do object to the

13   sentence, and at this time, we also would move to dismiss

14   Count 12 pursuant to the plea agreement.

15             THE COURT:  I will grant the Government's

16   motion to dismiss that count.

17             Does the defense have any objection?

18             MR. SEARBY:  No objection other than those

19   already stated in regards to the enhancements, your

20   Honor, and I apologize if things had changed.  Does the

21   Court have the opportunity to recommend designation to

22   a --

23             THE COURT:  I can recommend, but it is not

24   controlling.

25             MR. SEARBY:  And could we have the

1  opportunity to voluntarily report so she can deal with
2  her medical issues?
3          THE COURT:  Well, her medical background
4  would be part of the PSR that the Bureau of Prisons would
5  consider, and presumptively, they would take that into
6  consideration relative to designating her.  I am not sure
7  if Butner takes female prisoners, and the other likely
8  one -- but I will ask the Bureau of Prisons to take her
9  health conditions into consideration in making a
10 designation.
11         MR. SEARBY:  Thank you, your Honor.
12         THE COURT:  Does the Government have any
13 objection to allowing her to self-report?
14         MS. RICE:  No, your Honor.
15         THE COURT:  Okay.  The way this will work,
16 the Bureau of Prisons will give you a designation, a time
17 and a place to report.  You need to follow whatever
18 direction they give you as to what federal correctional
19 facilities to report to and what date to do the
20 reporting.
21         Okay.  Unless there is something else, we
22 will adjourn.  So thank you.
23         (Hearing concluded at 12:21 p.m.)
24                 - - - - -
25

1

2                    C E R T I F I C A T E

3          I, George J. Staiduhar, Official Court

4    Reporter in and for the United States District Court,

5    for the Northern District of Ohio, Eastern Division,

6    do hereby certify that the foregoing is a true

7    and correct transcript of the proceedings herein.

8

9

10

11                    s/George J. Staiduhar
                       George J. Staiduhar,
12                    Official Court Reporter

13                    U.S. District Court
                       801 W. Superior Ave., Suite 7-184
14                    Cleveland, Ohio 44113
                       (216) 357-7128

15

16

17

18

19

20

21

22

23

24

25